ELI LILLY AND COMPANY, Plaintiff,

v.

ROUSSEL CORP., Roussel–Uclaf Holdings Corp., Roussel–Uclaf, S.A., Hoechst Marion Roussel North America, Biochimica Opos, S.P.A., The Rugby Group, Inc., Rugby Laboratories, Inc., American Home Products Corporation, American Cyanamid Company, Zenith Goldline Pharmaceuticals, Inc., and Zenith Laboratories, Inc., Defendants.

Civil Action No. 97–2009(JAG).

United States District Court, D. New Jersey.

July 7, 1998.

462

Michael R. Griffinger, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, Paul F. Ware, Jr., J. Anthony Downs, Goodwin, Procter & Hoar, Boston, MA, for Plaintiff.

Liza M. Walsh, Connell, Foley & Geiser, Roseland, NJ, Steven F. Molo, Louise R. Radin, Winston & Strawn, New York, NY, for Defendants, Roussel Corp., Roussel Uclaf Holdings Corp., Roussel Uclaf S.A., Hoechst Marion, Roussel, Inc., The Rugby Group, Inc. and Rugby Laboratories, Inc.

James M. Andrews, Friedman Siegelbaum, Roseland, NJ, Peter O. Safir, Stacy L. Ehrlich, Kleinfeld, Kaplan & Becker, Washington, DC, for Defendant, Biochimica Opos, S.P.A.

William L. Mentlik, Roy H. Wepner, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, for Defendants, Zenith Goldline Pharmaceuticals, Inc. and Zenith Laboratories, Inc.

Donald A. Robinson, Robinson, Lapidus & Livelli, Newark, NJ, Peter L. Zimroth, Arnold & Porter, New York, NY, William J. Ruane, American Home Products Corporation, Madison, NJ, Steven G. Reade, Arnold & Porter, Washington, DC, for Defendants, American Home Products Corporation and American Cyanamid Company.

## OPINION

GREENAWAY, District Judge.

### INTRODUCTION

This matter comes before the Court on the motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and Fed.R.Civ.P. 9(b) of defendants Roussel Corporation ("Roussel Corp.").; Roussel–Uclaf Holdings Corporation ("RU Holdings"); Hoechst Marion Roussel, Inc. (erroneously named in the Complaint as Hoechst Marion Roussel North America); and The Rugby Group, Inc. and Rugby Laboratories, Inc. (collectively "Rugby"). Defendants Roussel–Uclaf, S.A. ("Roussel–France") and Biochimica Opos, S.P.A. ("Opos")[1] have moved to dismiss for insufficiency of service of process or, in the alternative, for failure to state a claim. Defendants American Home Products Corporation and its subsidiary, American Cyanamid Company (collectively "AHP"), and defendants Zenith Goldline Pharmaceuticals, Inc. and its subsidiary, Zenith Laboratories, Inc. (collectively "Zenith"), have moved to dismiss the counts against them (counts III, IV, X and XI) pursuant to Fed.R.Civ.P. 12(b)(6).

Plaintiff Eli Lilly ("Lilly"), a pharmaceutical company, filed the instant action on April 18, 1997 against its competitors, Opos and the Roussel Defendants.[2] Lilly alleges that Opos and the Roussel Defendants fraudulent-

---

1. The plaintiffs allege the following relationships between the Roussel defendants: Hoechst Marion Roussel, Inc. ("HMRI") owns Roussel Corp., RU Holdings, Roussel–France, Rugby and Opos. Specifically, HMRI wholly owns and controls Roussel–France and Rugby. Roussel–France wholly owns and controls RU Holdings and Opos. RU Holdings wholly owns and controls Roussel Corp. An officer of HMRI currently serves as plant manager at Opos and directs the activities of Opos. The President of Opos, Mr. E. Fontana, is also a vice-president of HMRI.

2. The Court shall refer to Roussel Corp., RU Holdings, HMRI and Roussel–France as the Roussel Defendants.

ly obtained approval from the Federal Drug Administration ("FDA") to sell bulk cefaclor[3] (an antibiotic) to drug manufacturers in the United States. Lilly has also named as defendants other pharmaceutical companies (AHP, Zenith and Rugby) that purchased bulk cefaclor from Opos and manufactured retail dosage units. Lilly alleges that Opos and the Roussel Defendants violated the Lanham Act, 15 U.S.C. § 1126(b), (h) and (i); the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; and the New Jersey Anti–Racketeering Act, N.J. Stat. Ann. § 2C:41–1, *et seq.* Lilly also alleges that Opos and Roussel Defendants committed common law fraud; negligent misrepresentation; common law conspiracy; and tortious interference with business relationships. Lilly also alleges violations of the Lanham Act, 15 U.S.C. § 1125(a), the New Jersey Unfair Competition Act, N.J. Stat. Ann. § 56:4–1; common law unfair competition; and unjust enrichment against all the defendants.

This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b), as well as supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(3).

Defendants Opos and Roussel–France have moved to dismiss for insufficiency of service of process or, in the alternative, for failure to state a claim. The remaining defendants have moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). For the following reasons, the Court shall deny Opos' and Roussel–France's motion to dismiss for insufficiency of service of process but shall grant the motion to dismiss the Complaint for failure to state a claim as to Counts I through XIII. Defendants' motion to dismiss Count XIV is denied. Defendants' motion to dismiss Count XV is granted based on the Court's ruling on Count XIV.

## PLAINTIFF'S ALLEGATIONS

Since 1979, Lilly has manufactured and sold the antibiotic drug cefaclor under the brand name "CECLOR". For many years Lilly was the only manufacturer of cefaclor approved by the FDA. Lilly holds a number of process patents that relate to methods of manufacturing cefaclor. Lilly also owned a patent on the cefaclor compound which expired in 1992.

In 1990 or 1991, the Roussel Defendants, through Roussel Corp., Roussel–France and RU Holdings, solicited Lilly to purchase bulk cefaclor from Opos. Opos is an Italian chemical company that manufactures bulk pharmaceutical chemicals for generic drug companies. Lilly visited the Opos manufacturing facility in Milan, Italy, where the Roussel Defendants represented that Opos would be producing the bulk cefaclor. The Roussel Defendants represented to Lilly that their manufacturing process would not infringe upon Lilly's patents. However, Lilly declined to purchase bulk cefaclor from the Roussel Defendants.

In March 1991, Roussel Corp. and Opos requested that Lilly identify all process patents it owned which might be infringed if the Roussel Defendants imported or sold cefaclor in the United States.[4] By letter dated May 15, 1991, Lilly identified its process patents that covered its cefaclor manufacturing process. On August 26, 1991, Roussel Corp. represented to Lilly that it had reviewed Lilly's process patents and that the manufacturing process of cefaclor that Opos planned to use would not infringe upon any of Lilly's patents.

In 1992, defendant Opos sought FDA approval to sell bulk cefaclor in the United States.[5] Opos submitted the required Ab-

---

3. Cefaclor can be manufactured in both bulk form and in retail dosage forms or units, such as tablets, capsules and liquid suspensions.

4. This request is a preparatory step under 35 U.S.C. § 287(b)(4)(A), to the filing of a request for FDA approval of a new antibiotic drug and is designed to put the applying entities on notice of any patent issues that may be raised by a new drug application.

5. Before a manufacturer may market a prescription drug in the United States, it must file an application and obtain approval from the FDA pursuant to 21 U.S.C. §§ 355 and 357 and 21 C.F.R. part 314, *et seq.*

 In order to market a new or innovator drug, an applicant must submit a New Drug Application ("NDA") which must demonstrate that the drug is safe and effective for the therapeutic uses indicated in the labeling and promotional material for the drug. The NDA must contain a de-

breviated Antibiotic Drug Application ("AADA") to the FDA's offices in Maryland by mail or wire. The FDA approved Opos' AADA in April 1995. On April 27, 1995, Lilly commenced a patent infringement action against Opos, AHP and Zenith in the United States District Court for the Southern District of Indiana ("Indiana Action") which is still pending.[6] From April 1995 until late 1996, Opos manufactured and sold bulk cefaclor monohydrate, the active ingredient in cefaclor finished products, in the United States.

In 1994 or early 1995, AHP and Zenith entered into agreements with Opos and the Roussel Defendants pursuant to which Opos and the Roussel Defendants would provide AHP's and Zenith's anticipated commercial requirements for bulk cefaclor. On April 27, 1995, defendants AHP and Zenith obtained authorization from the FDA to manufacture and sell retail dosage units of generic cefaclor made from Opos' cefaclor.[7] Zenith entered into an agreement with Rugby to provide it with retail dosage units of cefaclor. AHP, Zenith and Rugby marketed, distributed and sold generic cefaclor in competition with Lilly's cefaclor products.

In April 1995, as part of a proceeding initiated in Italy to challenge Opos' manufacturing of cefaclor ("Italian Action"), Lilly inspected Opos' manufacturing facility in Milan, Italy and obtained copies of two manufacturing tickets.[8] However, when Lilly attempted to reproduce the cefaclor manufacturing process reflected in the Opos manufacturing tickets, it discovered that "the

purported cefaclor manufacturing process reflected in the Opos documents was not used to manufacture Opos Cefaclor." Complaint ¶ 59. The manufacturing process reflected in Opos' documents "was not capable of producing sufficient quantities of certain necessary intermediate compounds to constitute a viable production process for cefaclor." *Id.*

In 1995, the FDA received several complaints about generic cefaclor formulated from Opos' bulk cefaclor including reports of adverse reactions to the drug. As a result thereof, in 1996, the FDA investigated Opos' AADA and its facility in Milan, Italy. The FDA discovered that the Opos cefaclor marketed and sold in the United States was not manufactured by Opos, was not manufactured in commercial quantities at the Opos plant in Milan and was not manufactured according to the process represented in the AADA.

On December 12, 1996, the FDA informed Opos that it had found that its AADA contained false and misleading information. In a letter to Mr. E. Fontana, the President of Opos, the FDA stated:

> The Center for Drug Evaluation and Research has found that your firm submitted false and misleading information in applications filed with this Agency. This finding is based upon information provided to us by officials of your parent firm regarding the manufacturing process of the bulk drug Cefaclor USP in approved Abbreviated Antibiotic Drug Application 64–072 and

---

tailed description of how the drug will be manufactured.

Subject to the patent rights of a drug innovator, other manufacturers may seek FDA approval to market generic versions of FDA-approved drugs. A generic drug must be bioequivalent to the innovator drug, i.e., identical in active ingredients, strength, dosage form, route of administrations and conditions of use. 21 C.F.R. § 314.92(a). An applicant must file an Abbreviated Antibiotic Drug Application ("AADA") which must demonstrate that the generic antibiotic will be bioequivalent to the innovator drug and will be manufactured and marketed in accordance with approved practices and standards. 21 U.S.C. § 355(j).

**6.** Lilly filed a motion for a preliminary injunction in the Indiana Action which the district court denied and the Federal Circuit affirmed. Tr. at

30:5–11 ("Tr." is a reference to the transcript of the Court's oral argument held on June 22, 1998). Presently, summary judgment motions are pending before the district court. In the case *sub judice,* Lilly alleges that Opos made fraudulent statements to the Court in the Indiana Action. However, the Indiana Action has no bearing on this litigation.

**7.** AHP and Zenith needed approval from the FDA to sell retail dosage units of cefaclor in the United States. They also had to obtain the bulk cefaclor from an FDA-approved source. *See* 21 U.S.C. §§ 355 and 357.

**8.** The manufacturing tickets describe in exact detail how Opos made commercial batches of bulk cefaclor, e.g., describing the ingredients, quantities, order of mixture, temperatures and other processing conditions.

in the Drug Master File [9] for this product and in two other Abbreviated Antibiotic Drug Applications. Evidence of manufacturing discrepancies was found in the May 1996 FDA inspection of your facility. Such a finding poses a significant question with regard to the reliability of the data and information contained in the applications that your firm has filed with this Agency. *See* Complaint, Ex. A.

On October 7, 1996, prior to the FDA's announcement that it had found false and misleading statements in the Opos AADA, defendant Roussel Corp. wrote a letter to its customers of bulk cefaclor, including AHP and Zenith. The letter stated that due to documentation and record-keeping issues in the chemical production process of Opos, Roussel Corp. had temporarily ceased all shipments of bulk cefaclor in the United States. On November 7, 1996, Roussel Corp. announced that it was withdrawing the AADA for Opos bulk cefaclor.[10] Roussel Corp. further advised its customers that it would voluntarily recall all unprocessed lots of bulk cefaclor, but this recall would not affect mid-process or finished cefaclor products.

The following day, November 8, 1996 (before the FDA's letter), Roussel–France publicly stated that the recall of Opos cefaclor was voluntary and that the recall was necessary due to some "incompleteness" in Opos's submissions to the FDA. Roussel–France further announced that the description of the production process in the Opos AADA was "not as detailed as the FDA requires" and that the "incompleteness" of the FDA submissions was "purely an administrative issue" and "there is no quality problem." Complaint ¶ 72. On February 6, 1997, Rous-

sel–France issued a statement announcing that the FDA was concerned about the irregularities in the documentation provided by Opos and therefore, recommended that finished dosage forms of cefaclor be recalled at the wholesale level. *Id.* ¶ 74.

AHP and Zenith continued to market and sell retail dosage units of cefaclor made from Opos' bulk cefaclor until February 1997. At that time, they sent a product recall notice to their wholesale customers indicating a recall of all generic cefaclor at the wholesale level due to record keeping and documenting issues at Opos' Milan, Italy factory. In the recall notices, AHP and Zenith informed their customers that the FDA had designated the situation as a Class II Health Hazard. AHP and Zenith notified their customers that the FDA defines a Class II Health Hazard as a situation which may cause potentially serious but reversible adverse health consequences.

Lilly commenced the instant action on April 18, 1997, alleging violations of the Lanham Act and RICO and their New Jersey statutory equivalents as well as a host of common law claims. In essence, the Complaint asserts that Opos and the Roussel Defendants obtained FDA approval to sell bulk cefaclor in the United States by making false and misleading representations about how and where they manufactured bulk cefaclor. Lilly claims that Opos used a different process to manufacture bulk cefaclor than had been identified in its AADA.[11] Lilly further alleges that Opos did not manufacture bulk cefaclor in a facility in Italy, as represented to the FDA, but instead manufactured it in a facility in Romania.[12] The Complaint also alleges that Opos and the

9. The Drug Master File is a submission to the FDA which can be used either (i) to permit the person making the submission to incorporate by reference the information in the Drug Master File when submitting a drug approval application, or (ii) to permit other persons to rely upon the information in the Drug Master File to support their own approval applications to the FDA without the original submitted of the Drug Master File having to disclose the information in the File to other persons. Complaint ¶ 44.

10. At the same time, Roussel Corp. also withdrew the AADAs for two other drugs—clindamycin phosphate and minocycline.

11. The applicant must identify in the AADA the manufacturing facilities where the generic drug will be manufactured and must submit batch production records that demonstrate the manufacturing process for a representative sample of the drug. 21 C.F.R. §§ 314.50(d)(1), 314.50(e)(1), 314.50(e)(2), 314.94(a)(9), 314.94(a)(10).

12. The FDA relies upon the representations made by the manufacturer in its AADA. The FDA may not approve an AADA which contains an untrue statement of material fact. 21 U.S.C. § 355(j)(3)(k).

Roussel Defendants made these same misrepresentations to Lilly in 1990 or 1991. Lilly further alleges that all of the defendants made misleading statements about the reasons for the withdrawal of the Opos AADA and the recall of Opos cefaclor. Lilly also alleges that AHP, Zenith and Rugby misleadingly used the terms "generic", "cefaclor" or "alternative to brand name drugs" in product inserts and marketing materials to refer to Opos cefaclor thereby implying that the FDA had determined that their retail dosage units of cefaclor were safe and effective.

Defendant Opos is an Italian company based in Italy. Defendant Roussel–France is a French company based in France. Lilly attempted to serve defendants Opos and Roussel–France by mailing the Summons and Complaint to their offices in their respective countries. Opos and Roussel–France received the Summons and Complaint; however, they moved to dismiss for insufficiency of service, alleging that service by mail violates the Hague Convention. In the alternative, Defendants Opos and Roussel–France moved, along with the other defendants, to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6).

## DISCUSSION

### INSUFFICIENCY OF SERVICE OF PROCESS

■ Rule 4 of the Federal Rules of Civil Procedure governs service of process. When process is served abroad, it must comply with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361 ("Hague Convention"). *See* Fed.R.Civ.P. 4(f)(1); *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 698, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988). The provisions of the Hague Convention are mandatory; failure to comply voids the attempted service. *See*

*Volkswagenwerk,* 486 U.S. at 698, 108 S.Ct. 2104. The purpose of the Hague Convention was to create an "appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time." *See* Hague Convention, Preamble, 20 U.S.T. at 362.

The Hague Convention authorizes several different ways to effectuate service of process upon a foreign defendant. The primary method, set forth by Articles 2 through 6, requires each signatory country to establish a Central Authority to monitor and ensure proper service. Articles 8 and 9 allow for service by way of diplomatic channels or consular agents, respectively. Article 11 empowers the signatory countries to agree to any other method of service not specifically provided for in the Hague Convention. Article 19 permits service by any method of service permitted by the internal laws of the country in which service is being made.

■ Lilly attempted to serve defendants Opos and Roussel–France[13] under Article 10. Article 10 provides in relevant part:

Provided the State of destination does not object, the present Convention shall not interfere with—

(a) the freedom to send judicial documents, by postal channels, directly to persons abroad,

(b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,

(c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

Article 21 sets forth the formal procedure by which objections to service under Article 10(a) are to be made.[14] *See* Hague Convention, art. 21. France and Italy have not objected to such service.[15] *See* Hague Con-

---

**13.** France, Italy and the United States are signatories to the Hague Convention; therefore, they are bound by its terms.

**14.** Article 21 provides:
Each contracting State shall, ... inform the Ministry [of Foreign Affairs of the Netherlands], where appropriate, of—

(a) opposition to the use of methods of transmission pursuant to articles 8 and 10.

**15.** France objected to Article 8, but has not objected to Article 10(a). *See* Hague Convention, Annex, n.12, at 128.

vention, Annex, n.12 & 16.[16] Defendants Opos and Roussel–France contend that Article 10 of the Hague Convention does not authorize service by mail because the word "send" used in Article 10(a) is not the equivalent of service of process.

The U.S. Courts of Appeal are split over the proper interpretation of Article 10(a). Neither the Third Circuit nor the United States Supreme Court have addressed the issue.

### The Second Circuit

The Second Circuit and many district courts have held that Article 10(a) authorizes service of process by mail. *See, e.g., Ackermann v. Levine*, 788 F.2d 830, 838 (2d Cir. 1986); *EOI Corp. v. Medical Mktg. Ltd.*, 172 F.R.D. 133, 142 (D.N.J.1997); *R. Griggs Group Ltd. v. Filanto S.P.A.*, 920 F.Supp. 1100 (D.Nev.1996); *Zisman v. Sieger*, 106 F.R.D. 194 (N.D.Ill.1985); *Chrysler Corp. v. General Motors*, 589 F.Supp. 1182 (D.D.C. 1984). These courts have held that the word "send" in Article 10(a) was intended to mean "service". *See Ackermann*, 788 F.2d at 838. The Appellate Division of the Superior Court of New Jersey has also concluded that Article 10(a) allows service by mail:

> This is the only construction which will achieve the [Hague] Convention's stated goal of effective, expeditious and inexpensive service, ... of providing a simpler way to serve process abroad.... Moreover, interpretation of Article 10(a) as permitting mail service is generally considered the sounder view by those considered to be authoritative in the field ... It appears that a majority of the courts which have considered the matter have found mail service is permitted.

*Gapanovich v. Komori Corp.*, 255 N.J.Super. 607, 613–14, 605 A.2d 1120 (App.Div.1992) (citations omitted).

### The Eighth Circuit

Conversely, the Eighth Circuit and many district courts have held that Article 10(a) does not authorize service of process by mail. *See, e.g., Bankston v. Toyota Motor Corp.*, 889 F.2d 172 (8th Cir.1989); *Golub v. Isuzu Motors*, 924 F.Supp. 324 (D.Mass.

1996); *Raffa v. Nissan Motor Co.*, 141 F.R.D. 45 (E.D.Pa.1991); *Hantover, Inc. v. Omet*, 688 F.Supp. 1377, 1385 (W.D.Mo. 1988). These courts have held that the word "send" in Article 10(a) is not equivalent to "service of process". These courts have concluded that the use of the word "service" in Article 10(b) and (c) is evidence that the drafters of the Hague Convention intended to distinguish between "sending" judicial documents and "serving" process. *See Bankston*, 889 F.2d at 173–74. The Eighth Circuit and its progeny concluded that "Article 10(a) merely provides a method for sending subsequent documents after service of process has been obtained by means of the central authority." *Id.* at 174.

### Article 10(a) Authorizes Service by Mail

This Courts finds the Second Circuit's interpretation of Article 10(a) persuasive. In addition to the judicial authority, both within and outside the District of New Jersey, *see, e.g., EOI*, 172 F.R.D. at 142; *Ackermann*, 788 F.2d at 838; *R. Griggs*, 920 F.Supp. 1100; *Zisman*, 106 F.R.D. 194; *Chrysler*, 589 F.Supp. 1182, the United States State Department interprets Article 10(a) as allowing service by mail. Subsequent to the Eighth Circuit's decision in *Bankston*, 889 F.2d 172, the State Department's legal advisor stated that "the decision of the Court of Appeals in *Bankston* is incorrect to the extent that it suggests that the Hague Convention does not permit as a method of service the sending of a copy of the summons and complaint by registered mail to a defendant in a foreign country." (Letter from Alan J. Kreczco, U.S. Dep't of State Legal Advisor to the Admin. Off. of the U.S. Courts and the Nat'l Center for State Courts of 3/14/91, excerpted at 30 I.L.M. 260.) "Although not dispositive, courts often give great weight to treaty interpretations made by the Executive Branch." *R. Griggs*, 920 F.Supp. at 1106 (citing Restatement (Third) of Foreign Relations Law of the United States § 326(2) (1986)); *see also Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982).

---

**16.** Several countries specifically objected to Article 10(a). *See* Hague Convention, Annex n.8, 10, 13, 21, 28; *EOI*, 172 F.R.D. at 138 & n. 13.

The role of a court in interpreting a treaty is "limited to ascertaining and enforcing the intent of the treaty parties." *MacNamara v. Korean Air Lines,* 863 F.2d 1135, 1143 (3d Cir.1988); *see also Zicherman v. Korean Air Lines Co.,* 516 U.S. 217, 226, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996) (noting that a court should consider the negotiating and drafting history of the treaty and the "post-ratification understanding of the contracting parties"). Other signatories to the Hague Convention have indicated that they understood Article 10(a) as referring to service of process. In 1977, a special commission of representatives from the signatory states, including the United States and France,[17] met to discuss the operation of the Hague Convention. *See* Report on the Work of the Special Commission on the Operation of the Convention, 17 I.L.M. 319 (Mar.1978) ("Special Commission"). The Special Commission reported that:

> It was determined that most of the States made no objection to the service of judicial documents coming from abroad directly by mail in their territory. For those States who objected to this channel, a distinction was made between use of the postal channel as the sole method of service and service through the postal channel which was complementary to another means of effecting service.

*Id.* at 326. The Special Commission further noted that, "[t]he States which object to the utilization of service by post sent from abroad are known thanks to the declaration made to the Ministry of Foreign Affairs." *Id.* at 329.

In addition, the Hague Conference on Private International Law working in "close cooperation" with the signatory states, created the Practical Handbook on the Operation of the Hague Convention of 15 November, 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (1992) ("Practical Handbook"). *See* Practical Handbook at vi. The Practical Handbook specifically lists service by mail as valid under the Hague Convention. *Id.* at v. It also discusses the drafting and negotiating history of Article 10(a) and concludes that

the "implicit understanding of the delegates at the 1977 Special Commission meeting and indeed of the legal literature of the Hague Convention and its predecessor treaties" was that Article 10(a) allows service of process by mail. *Id.* at 44.

Finally, Bruno Ristau, who served as the United States representative to the Special Commission and who has been identified as the leading commentator on the Hague Convention, has explained that Article 10(a) applies to service of process. *See EOI,* 172 F.R.D. at 137 & n. 11. The Second Circuit noted that Mr. Ristau has studied the drafting history of the [Hague] Convention and reached the "inescapable" conclusion that Article 10(a) applies to service of process. *See Ackermann,* 788 F.2d at 839 (citing 1 B. Ristau, International Judicial Assistance (Civil and Commercial) §§ 4–10, 132, §§ 4–28, 165–67 (1984)). In the 1995 revision to his treatise, Mr. Ristau states that:

> Article 10(a) provides that, unless a contracting state has by its declaration expressly prohibited it, service of foreign judicial documents may be effected within its territory by mail ... The negotiating history of Article 10 ... indicates that "sending" of judicial documents by mail was intended to include service of process.

1 B. Ristau, International Judicial Assistance (Civil and Commercial) § 4–3–5(2), 148–49 (1995).

In 1989, the signatory States met for a Second Special Commission. *See* The Hague Conference on Private International Law: Special Commission Report on the Operation of the Hague Service Convention and the Hague Evidence Convention, 28 I.L.M. 1556, 1561 (Apr.1989) ("Second Special Commission"). The Second Special Commission rejected the *Bankston* decision and wrote:

> It was pointed out that the postal channel for service constitutes a method which is quite separate from service via the Central Authorities or between judicial officers. Article 10(a) in effect offered a reservation to Contracting States to consider that service by mail was an infringement of their

---

**17.** Italy did not ratify the Convention until November 25, 1981. Hague Convention, Annex, n.16.

sovereignty. Thus, theoretical doubts about the legal nature of the procedure were unjustified. *Id.* at 1561.

The Courts which have rejected the *Bankston* interpretation rejecting service by mail in favor of the *Ackermann* interpretation of Article 10(a) have observed that the [Hague] Convention's drafters' use of the word "send" instead of "service" is not unique to Article 10(a). *See EOI,* 172 F.R.D. at 138–39. For example, Article 21 uses the phrase "methods of transmission" as a synonym for service. *Id.* at 138. Courts have concluded that "it is reasonable that the drafters simply varied the language in [Article 10(a) ] when discussing service." *Id.; see also R. Griggs,* 920 F.Supp. at 1105.

Furthermore, if Article 10(a) did not apply to service of process, but "merely provides a method for sending subsequent documents after service of process has been obtained by means of the central authority," *Bankston,* 889 F.2d at 174, it would have been illogical for the drafters to include it in the midst of provisions addressing alternative methods of service such as Article 10(b) and 10(c). "The placement of one lone provision dealing with the mailing of nonservice documents in the midst of fifteen articles addressing service of process, would be inconsistent with the structure of the entire [Hague] Convention." *R. Griggs,* 920 F.Supp. at 1105. "Because the [Hague] Convention as a whole does not purport to address aspects of litigation other than service of process, Article 10(a) would be anomalous if it related to a subject other than service." *Id.; see also EOI,* 172 F.R.D. at 137 (citations omitted) ("Article 10(a) would be out of place in Article 10, and in the entire [Hague] Convention, if it did not relate

to 'sending' judicial documents for the purpose of 'serving process.' "); *Borschow Hosp. & Medical Supplies, Inc. v. Burdick–Siemens Corp.,* 143 F.R.D. 472, 480 (D.P.R.1992) ("It is beyond peradventure that the sole aim of the [Hague] Convention is to regulate service of process on non-resident foreign defendants.").[18]

■ Defendants Opos and Roussel–France argue that this Court should find that France and Italy would object to service by mail because these nations do not allow service in domestic actions to be effected by mail. However, a signatory state's internal law is not relevant to Article 10(a). As stated by the Appellate Division:

We are called upon to construe the [Hague] Convention and as to that the meaning of Article 10(a) must be the same with respect to all the signatory nations. Their internal laws as to mail service may be, and undoubtedly are, diverse. The meaning of this international treaty must be uniform.

*Gapanovich,* 255 N.J.Super. at 615, 605 A.2d 1120.

Furthermore, numerous courts have held that service by mail is valid in France and Italy. *See R. Griggs,* 920 F.Supp. at 1103, 1107–08 (Italy); *Robins v. Max Mara. U.S.A., Inc.,* 923 F.Supp. 460, 469 (S.D.N.Y. 1996) (Italy); *G.A. Modefine, S.A. v. Burlington Coat Factory Warehouse Corp.,* 164 F.R.D. 24, 25 (S.D.N.Y.1995) (Italy); *Melia v. Les Grands Chais de France,* 135 F.R.D. 28, 35–36 (D.R.I.1991) (France); *Hutchins v. Beneteau (U.S.A.), Ltd. S.A.,* Civ. A. No. 89–4806, 1990 WL 17533, *2 (E.D.La. Feb.15, 1990) (France). Moreover, as shown above, various other authorities have stated that

---

**18.** The Supreme Court has not yet addressed Article 10(a). However, the Court in *R. Griggs,* 920 F.Supp. at 1106–07, interpreted the Supreme Court's opinion in *Volkswagenwerk,* 486 U.S. 694, 108 S.Ct. 2104, 100 L.Ed.2d 722, as holding that the Hague Convention does not apply to documents which are not transmitted for service of process. The *Volkswagenwerk* Court held that Article I of the Hague Convention which provides that the Convention applies to the transmittal of judicial or extrajudicial documents for service abroad, refers to service of process in the technical sense. *Id.* at 700, 108 S.Ct. 2104. The Supreme Court held that Article I applied to "formal delivery of documents that is

legally sufficient to charge the defendant with notice of a pending action." *Id.* Based on the Supreme Court's interpretation of Article I, the Court in *R. Griggs* held that "the *Bankston* rationale, which reads 10(a) as 'merely provid[ing] a method for sending documents after service of process has been obtained', has been, in effect, overruled." *R. Griggs,* 920 F.Supp. at 1107. The *R. Griggs* Court further noted that the reasoning of *Ackermann* holding that Article 10(a) would be superfluous unless it referred to sending documents for service, "rings truer after *Volkswagenwerk* that it did previously." 920 F.Supp. at 1107 n. 11.

Article 10(a) allows service by mail unless a country has formally objected. However, neither France nor Italy have objected. If France and Italy objected to service by mail under Article 10(a), they should have declared their objection in accordance with Article 21. Moreover, since France did formally object to Article 8, it is obviously familiar with the procedure.

Neither Roussel–France nor Opos denies that they actually received the Summons and Complaint. "Service of process must satisfy both the statute under which service is effectuated [in this case, the Hague Convention] and constitutional due process." *Ackermann*, 788 F.2d at 838. The purpose of the rules governing service of process is to insure that parties receive actual notice of claims against them. *See Hanna v. Plumer*, 380 U.S. 460, 462 n. 1, 85 S.Ct. 1136, 14 L.Ed.2d 8(1965). "The primary impetus for requiring service of process is 'to create appropriate means to insure that judicial and extrajudicial documents to be served abroad' are 'brought to the notice of the addressee in sufficient time . . .'" *EOI*, 172 F.R.D. at 143 (quoting Hague Convention, at Preamble); *see also Volkswagenwerk*, 486 U.S. at 698, 108 S.Ct. 2104 (noting that the Hague Convention was intended to "provide a simpler way to serve process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad."). Service by mail satisfies the due process requirements of adequate notice and an opportunity to be heard. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).[19]

Since service by mail satisfies due process and is authorized under the Hague Convention, Defendants Opos' and Roussel–France's motion to dismiss for insufficiency of service of process is denied.[20]

### MOTION TO DISMISS

#### A. Standard for a Motion to Dismiss

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) may be granted only, if accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996); *Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir.1993); *Bartholomew v. Fischl*, 782 F.2d 1148, 1152 (3d Cir.1986). The Court may not dismiss the complaint unless plaintiff can prove no set of facts which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Graves v. Lowery*, 117 F.3d 723, 726 (3d Cir.1997); *Unger v. National Residents Matching Program*, 928 F.2d 1392, 1395 (3d Cir.1991); *Angelastro v. Prudential–Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir.1985). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In setting forth a valid claim, a party is required only to plead "a short plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a).[21] To

---

**19.** Lilly claims that in addition to serving Defendant Roussel–France by mail pursuant to Article 10(a), it also served Roussel–France by personal service on its President, Michel Prou at Roussel–France's office in New Jersey. Roussel–France has submitted sworn testimony that Mr. Prou is not and has never been an officer of Roussel–France. However, since Lilly's service of process under Article 10(a) was effective, its failed attempt to serve Roussel–France by personal service is of no consequence.

**20.** As stated above, Roussel–France and Opos moved to dismiss for insufficiency of service of process pursuant to Fed.R.Civ.P. 12(b)(5) or, in the alternative, to dismiss pursuant to Fed. R.Civ.P. 12(b)(6). Since the Court has denied their motion to dismiss for insufficiency of service of process, the Court will address their motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)

together with the motion to dismiss of the other defendants.

**21.** [Counsel for] Lilly has submitted a certification and exhibits to accompany its Consolidated Memorandum in Opposition to Defendants' Motion to Dismiss. However, unless a Court converts a Rule 12(b)(6) motion into a motion for summary judgment pursuant to Fed.R.Civ.P. 56, the Court cannot consider material outside the pleadings (i.e. facts presented in briefs, affidavits or exhibits). *See* Fed.R.Civ.P. 12(b)(6). Rule 12(b)(6) vests in the district court the discretion to determine whether or not to exclude matters outside the pleadings. *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk Southern Corp.*, 109 F.3d 993, 996 (4th Cir.1997). Accordingly, the Court concludes that it is more appropriate in this instance to exclude Lilly's [counsel's] certification and exhibits than to convert defendants'

withstand a motion to dismiss, "a plaintiff is not required to provide evidence of or prove the truthfulness of his complaint." *Quinones v. Szorc*, 771 F.2d 289, 291 n. 3 (7th Cir.1985). However, the Court is not required to accept conclusory allegations. *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Thus, the "complaint must set forth sufficient information to suggest that there is some recognized legal theory upon which relief may be granted." *District of Columbia v. Air Florida*, 750 F.2d 1077, 1078 (D.C.Cir.1984).

**B. *Section 43(a) of the Lanham Act (Counts I and III)***

Section 43(a) of the Lanham Act provides:
(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (1988). Section 43(a) "creates a cause of action for any false description or representation of a product." *U.S. Healthcare v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 921 (3d Cir. 1990). However, the broad language of section 43(a) "proscribes not only trademark infringement in its narrow sense, but more generally creates a federal cause of action for unfair competition." *AT & T v. Winback and Conserve Program*, 42 F.3d 1421, 1428 (3d Cir.1994).

motion to dismiss into one for summary judg-

"[A] failure to disclose facts is not actionable under § 43(a)". *U.S. Healthcare*, 898 F.2d at 921. However, "a statement is actionable under § 43(a) if it is affirmatively misleading, partially incorrect, or untrue as a result of failure to disclose a material fact." *Id.* The Lanham Act requires "neither proof of literal or obvious falsehood, nor intent to deceive." *Sandoz Pharm. Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 227 (3d Cir. 1990) (citing *Procter & Gamble Co. v. Chesebrough–Pond's, Inc.*, 747 F.2d 114, 118 (2d Cir.1984)). "The Lanham Act encompasses more than blatant falsehoods[;][i]t embraces 'innuendo, indirect intimations, and ambiguous suggestions' evidenced by the consuming public's misapprehension of the hard facts underlying an advertisement." *Id.* (citing *Procter & Gamble*, 747 F.2d at 119) A plaintiff can maintain an action under the Lanham Act even "where the advertisements are not literally false" so long as there is evidence of actual consumer confusion or deception. *Sandoz*, 902 F.2d at 228–29.

Lilly alleges that all the defendants:
> used labels or materials constituting false and misleading descriptions of the physical character, quality, source and nature of Opos cefaclor;
>
> falsely and misleadingly made the express and/or implied representation that Opos cefaclor was manufactured at and by a facility approved by the FDA for the manufacture of cefaclor;
>
> falsely and misleadingly made the express and/or implied representation that they were manufacturing and selling Opos cefaclor only after obtaining FDA approval as a generic drug without the use of fraud or misrepresentation; and
>
> falsely and misleadingly made the express and/or implied representation that Opos cefaclor was a safe and effective generic drug which the FDA approved without the use of fraud or misrepresentation.

*See* Complaint ¶¶ 88–90, 99, 104.

Lilly alleges that in addition, Opos and the Roussel Defendants:
> falsely and misleadingly identified Opos as the manufacturer of cefaclor while

ment.

failing to disclose that Opos cefaclor was not manufactured by Opos or at the Opos facility; and

omitted or failed to disclose that they procured FDA approval of the Opos AADA unlawfully, through fraud and misleading statements to the FDA.

Complaint ¶ 90.

Lilly further alleges that Rugby, AHP and Zenith:

misleadingly represented in published materials that their retail dosage units of cefaclor were generic equivalents to brand name drug products; [22]

misleadingly stated or implied in their product inserts and/or marketing materials that their retail dosage units of cefaclor had been determined to be safe and effective for the indicated uses; [23] and

used the compendium name,[24] "cefaclor" and described their drug products as "generic cefaclor" and as "alternatives to brand-name drug products" thereby falsely and misleadingly implying that the manufacturers proved and the FDA validly found, without the use of fraud or misrepresentation, that the products meet all the requirements for a true generic version of cefaclor.

Complaint ¶¶ 101–03.[25]

Defendants argue that the Court must dismiss Lilly's claim under section 43(a) because it impermissibly attempts to redress violations of the Federal Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, under which no private right of action exists.

▮▮▮▮ The FDCA provides that "[a]ll such proceedings for the enforcement, or to restrain violations of [the FDCA] shall be by and in the name of the United States." 21 U.S.C. § 337(a). Every federal court that has addressed the issue has held that the FDCA does not create a private right of action to enforce or restrain violations of its provisions and accompanying regulations. *See Gile v. Optical Radiation Corp.*, 22 F.3d 540, 544 (3d Cir.1994); *Sandoz*, 902 F.2d at 231; *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105 (2d Cir.1997); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1139 (4th Cir.1993). Only the federal government, by way of either the FDA or the Department of Justice, has exclusive jurisdiction to enforce violations of the FDCA. *See Summit Tech. Inc. v. High–Line Medical Instruments Co.*, 922 F.Supp. 299, 305 (C.D.Cal.1996).

▮▮▮▮ Lilly does not bring its claims under the FDCA. Defendants argue, however, that each of Lilly's allegations under Section 43(a) asserts that defendants' marketing of Opos cefaclor constituted an implied statement that Opos lawfully obtained FDA approval. Thus, defendants contend that Lilly is attempting to use the Lanham Act as a vehicle for the assertion of violations of the FDCA. In support of its argument, defendants refer the Court to *Sandoz*, where the Third Circuit

---

**22.** Lilly alleges that the name "generic" when used in an advertisement as an alternative to a brand name drug implies that the generic drug is a safe and effective product which the FDA approved without the use of fraud. Complaint ¶ 101.

**23.** Lilly alleges that the representation that a product is safe and effective implies to prospective purchasers that it was approved by the FDA to be safe and effective without the use of fraud. Complaint ¶ 102.

In its brief, Lilly asserts that AHP and Zenith stated that "safety and effectiveness of this product for use in infants less than 1 month of age have not been established" thereby implying that the FDA has found the drug to be safe and effective for older infants without the use of fraud or misrepresentation. *See* Pl's. Br. Opp. to Mot. to Dismiss, at p. 18. Lilly also argues that AHP and Zenith stated on their products that

"Federal law prohibits dispensing without a prescription". *Id.* Lilly contends that this label misleadingly implies that the FDA (without the use of fraud or misrepresentations) determined that Opos' cefaclor is safe and efficacious when dispensed with a prescription. *Id.* The Complaint is devoid of these allegations; therefore, the Court shall disregard them.

**24.** "Compendium name" refers to "the chief active ingredient in a generic drug." Complaint ¶ 31.

**25.** In its brief, Lilly alleges that Zenith falsely conveyed to the public that it had obtained FDA approval legitimately by stating in its advertising and promotional materials that the FDA approved its AADA for generic cefaclor. *See* Pl's. Br. Opp. to Mot. to Dismiss, at p. 18. Lilly did not assert this allegation in its Complaint; therefore, the Court shall disregard it.

held that "what the [FDCA does] not create directly, the Lanham Act does not create indirectly, at least not in cases requiring original interpretation of [the FDCA] or [its] accompanying regulations." 902 F.2d at 231.

The Court finds that Lilly's claims under the Lanham Act, in essence, seek redress for violations of the FDCA. Lilly asserts that defendants falsely and misleadingly made the express and/or implied representations (1) that "Opos cefaclor was manufactured at and by a facility approved by the FDA for the manufacture of Opos cefaclor"; (2) that "Opos cefaclor was being manufactured, distributed and sold only after obtaining FDA approval as a generic drug without the use of fraud or misrepresentation"; and (3) that "Opos cefaclor was a safe and effective drug which had been approved by the FDA without the use of fraud or misrepresentation." *See* Complaint ¶ 90. These allegations rely on interpretations of FDCA provisions and regulations promulgated thereunder. Lilly further alleges thⁿt by using the terms "generic", "cefaclor", "alternatives to brand-name drug products" and/or "safe and effective", AHP, Zenith and Rugby implied that "that the drug product is a safe and effective product which had been approved by the FDA without the use or fraud or misrepresentation" or that the drug product has been "lawfully proven by the manufacturers and validly found by the FDA, without the use of fraud and misrepresentation, to meet all the requirements for a true generic version of cefaclor." *See* Complaint ¶¶ 101–104. These allegations likewise seek to enforce the FDCA.

The Third Circuit has not addressed whether placing a drug in the market constitutes an implicit representation that the FDA properly approved it. However, the Fourth Circuit addressed this exact issue in a case with similar facts. *See Mylan,* 7 F.3d at 1137–39. In *Mylan,* a manufacturer of prescription drugs sued other drug manufacturers (including a manufacturer of generic drugs) for violations of section 43(a) of the Lanham Act. Mylan asserted that defendants obtained FDA approval of their drug application through fraud and misrepresentations. Mylan also alleged that defendants falsely represented that their drugs were bioequivalent to Mylan's drugs. *Id.* at 1137–38. Thus, Mylan asserted a Lanham Act claim predicated on two types of allegations: (1) that the defendants falsely represented or implied that the FDA properly approved their drugs; and (2) that the defendants falsely represented or implied that their drugs were bioequivalent to Mylan's drugs. *Mylan,* 7 F.3d at 1137–38.

The district court dismissed Mylan's claims under the Lanham Act. The Fourth Circuit reversed the dismissal of Mylan's claims alleging that defendants had falsely represented that their drug products were bioequivalent to Mylan's product. *Id.* at 1138. The Fourth Circuit found that Mylan had pleaded facts sufficient to support that claim because the complaint alleged that defendant "falsely represented" that their products were "bioequivalent to its innovator counterpart", that their products were "entitled to an AB rating"[26] or that their products were the "generic equivalent" to the innovator drug. *Id.*

However, the Court upheld the dismissal of Mylan's claims that defendants falsely represented or implied that their drugs had been properly approved by the FDA. *Id.* at 1139. The Court noted that Mylan's complaint did not point to any statement or representation in defendants' advertising which declared "proper FDA approval." *Id.* The Court added that such a "fatal deficiency" could not be cured by the contention that the "very act of placing a drug on the market, with standard package inserts often used for FDA-approved drugs, somehow implies (falsely) that the drug had been 'properly' approved by the FDA." *Mylan,* 7 F.3d at 1139.[27] The Court concluded that "[s]uch a

26. " 'AB' rating indicates that the drug is considered to be 'therapeutically equivalent' to the innovator drug." *Mylan,* 7 F.3d at 1138 n. 10.

27. The *Mylan* Court distinguished a failure to disclose non-approval from affirmative statements of approval, finding that "an affirmative misrepresentation that a product has 'FDA approval' is actionable under the Lanham Act (as opposed to a failure to disclose non-approval)." *Id.* at 1139. This distinction is premised on the fact that a misrepresentation of FDA approval "clearly misstates a fact and does not require an interpretation or application of FDA regulations. …[A] court can test the truth of the statement 'FDA approval' without any need to interpret FDA regulations. The question will simply be whether the FDA official conferred 'approval' or

theory is, quite simply, too great a stretch under the Lanham Act." *Id.*

The Fourth Circuit held that "[p]ermitting Mylan to proceed on the theory that the defendants violated § 43(a) merely by placing their drugs on the market, would in effect permit Mylan to use the Lanham Act as a vehicle by which to enforce the Food, Drug, and Cosmetic Act ("FDCA") and the regulations promulgated thereunder." *Mylan,* 7 F.3d at 1139. The Court further noted that Mylan had attempted "by ingenious pleading, to escape one principle of law by making it appear that another not truly appropriate rule is applicable..." *Id.* To state a claim under section 43(a), Mylan had to "point to some claim or representation that is reasonably clear from the face of defendants' advertising or package inserts." *Mylan,* 7 F.3d at 1139.

The United States District Court for the Eastern District of New York rejected a similar Lanham Act claim. *See Barr Lab., Inc. v. Quantum Pharmics, Inc.,* No. 90 Civ. 4406, 1994 U.S. Dist. LEXIS 2197 (E.D.N.Y. Feb. 2, 1994) ("*Barr Lab. II*").[28] In that case, Barr, a generic prescription manufacturer, brought a Lanham Act claim against its competitor, Quantum, after discovering that Quantum made false statements in applications to the FDA for approval of generic drugs and the FDA rescinded approval of those applications. Barr asserted that Quantum's description of its drug products as "generic," and "bioequivalent" and "dependable alternatives to brand-name drugs" falsely and misleadingly implied that Quantum had proved and the FDA had found that its products were bioequivalent. Relying on *Mylan,* the Court rejected Barr's claim, noting that the complaint did not allege that Quantum "used words or phrases which suggested 'positively' that the FDA had approved its drugs as bioequivalent; instead, it alleges that certain words or phrases implied FDA approval." *Barr Lab. II,* 1994 U.S. Dist. LEXIS 2197 at *36.

The Court finds the reasoning of *Mylan* and *Barr Lab. II* persuasive and shall dis-

miss Lilly's claims because they are all based on allegations that defendants falsely implied or represented that they properly obtained FDA approval of their drug products. Lilly has failed to point to any statements or representation in defendants' advertising which declared that they obtained "proper FDA approval." *See Mylan,* 7 F.3d at 1139.

At oral argument and in its submissions to the Court, Lilly argued that this Court should follow the portion of the Fourth Circuit's holding in *Mylan* which upheld the Lanham Act claim based on Mylan's allegations that defendants had falsely represented that their product was bioequivalent to Mylan's product. *See* Tr. at 38:19–24. As stated above, the Fourth Circuit found that Mylan had pleaded facts sufficient to support that claim because the complaint alleged that defendants "falsely represented" that their products were "bioequivalent to its innovator counterpart", that their products were "entitled to an AB rating" or that their products were the "generic equivalent" to the innovator drug. *Mylan,* 7 F.3d at 1138. Lilly claims that it has made similar allegations that defendants falsely represented that their product was bioequivalent to Lilly's CECLOR and that their product was generic cefaclor. In support of its argument, Lilly refers the Court to paragraphs 99 and 100 of the Complaint. *See* Tr. at 28:19–24, 39:12–18.

Paragraphs 99 and 100 state that AHP, Zenith and Rugby used labels, documentary materials, promotional information, brochures and advertising "which constituted or contained express and/or implied false and misleading descriptions and representations of the physical character, quality, source and nature of the cefaclor." Complaint ¶¶ 99 and 100 (quotation in both). Lilly claims that paragraphs 99 and 100 allege that defendants made false representations about their product. This Court disagrees.

In *Barr Lab. Inc. v. Quantum Pharmics, Inc.,* 827 F.Supp. 111 (E.D.N.Y.1993) ("*Barr Lab. I*"), *aff'd on reh'g,* No. 90 Civ. 4406, 1994 U.S. Dist. LEXIS 2197 (E.D.N.Y. Feb.

---

not." *Summit Tech., Inc. v. High–Line Med. Instruments Co.,* 933 F.Supp. 918, 933 n. 7 (C.D.Cal.1996)

**28.** Although unreported opinions have no precedential value, based on the similarity of facts between *Barr Lab. II* and the present case, this Court finds the reasoning of the *Barr Lab. II* Court persuasive.

2, 1994), the Court was confronted with strikingly similar allegations. The complaint alleged that defendants used labels or advertising "constituting false descriptions of the physical character, quality, nature and therapeutic value of the generic drugs." *Id.* at 118. The Court dismissed these allegations because they failed to specify the falsehoods or misrepresentations contained in the product labels or promotional literature. *Id.* The Court held that such broad and conclusory allegations did not provide defendants with notice of the wrong they allegedly committed. *Id.* The Court noted that Barr had not pleaded any facts demonstrating that Quantum's generic drugs did not contain the active ingredients of the innovator drug as represented. *Id.* The Court added that Barr had not asserted any facts alleging that Quantum included false bioequivalence data in its application to the FDA. *Id.* The Court noted, as in this case, that the FDA had found untrue statements and omissions concerning the production and testing of lots used to support approval of the applications which raised questions as to the reliability of the data submitted by Quantum. *Id.* However, the Court also recognized that neither the FDA, nor Barr, had found that Quantum's drugs were not bioequivalent to the innovator drug as represented by Quantum. *Id.*

The Court dismissed Barr's Lanham Act claims without prejudice. Barr amended its complaint and alleged that Quantum had used the terms "generic", "bioequivalent to", "affordable alternatives to" and had labeled its product according to its compendium name. *Barr Lab. II*, 1994 U.S. Dist. LEXIS 2197 at * 26. The amended complaint alleged that Barr's use of these terms constituted false and misleading representations because such descriptions falsely imply that Quantum's drug products were lawfully proven and validly found by the FDA to be bioequivalent to the brand-name drug. *Id.* The Court distinguished these allegations from those upheld by the Fourth Circuit in *Mylan.*

The Court held that unlike the complaint in *Mylan*, Barr's amended complaint did not allege "sufficiently particularized allegations of false or misleading representations; instead, it alleged that certain terms and phrases carry an informational load that includes assurances of the manufacturer's compliance with the FDA approval procedure to establish the bioequivalency of the drug products." *Barr Lab. II*, 1994 U.S. Dist. LEXIS 2197 at *33. The Court concluded that unlike Mylan, Barr had not asserted that Quantum's drugs were not bioequivalent to the innovator drugs. *Id.* Instead Barr's amended complaint alleged that consumers were falsely led to believe that the FDA approved Quantum's drugs as bioequivalent and such a claim must fail under *Mylan*. *Id.* at *33–34.

The allegations in Lilly's complaint are almost identical to the allegations in Barr's amended complaint in *Barr Lab. II*. Like Barr, Lilly has not alleged that defendants made false representations as to the quality, bioequivalency or safety of its products. Lilly has not alleged that defendants' cefaclor was not generic cefaclor, or that it was not bioequivalent to CECLOR or that it was not safe and effective. The broad and conclusory allegations of paragraphs 99 and 100 fail to specify the misrepresentations contained in the product labels or promotional literature. Furthermore, Lilly has not pleaded any facts demonstrating that defendants' generic products did not contain the active ingredients in Lilly's CECLOR (cefaclor) as represented. Lilly has not asserted any facts alleging that any of the defendants included false bioequivalence data in their AADAs to the FDA. *Id.* Instead, Lilly has alleged that defendants' use of the terms "generic", "cefaclor", "bioequivalent" or "alternative to brand-name drug products" implies that the manufacturers proved and the FDA found without the use of fraud or misrepresentation "that the drug product is a safe and effective product" that "meets all the requirements for a true generic version of cefaclor." *See* Complaint ¶¶ 101–103.

These claims do not allege that defendants misrepresented the quality of their products, but are based on defendants' misrepresentations that they properly obtained FDA approval. Under the reasoning of *Mylan* and *Barr Lab. II*, such a claim must fail.[29] The Lanham Act does not provide a

---

**29.** Lilly argues that this Court should not follow Judge Glasser's analysis in *Barr Lab. II*, but in-

right of action with respect to implied representations that defendants obtained FDA approval without the use of fraud.

### Recall Notices

Lilly alleges that all the defendants made false and misleading statements to wholesalers, distributors, pharmacies, physicians and the consuming public concerning the reasons for the withdrawal of the Opos AADA and the recall of Opos cefaclor. Complaint ¶¶ 91 and 105.

A statement is actionable under the Lanham Act if it was made "in a commercial advertising or publication to promote the good or service or otherwise further [defendant's] own business interest." *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 919 F.Supp. 756, 764–65 (D.N.J.1996). The Lanham Act does not define "advertising" or "promotion". However, courts have held that commercial advertising or promotion consists of four elements: (1) commercial speech (2) by a defendant in commercial competition with the plaintiff (3) for the purpose of influencing customers to buy the defendant's goods or services and (4) disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within the industry. *Gordon & Breach Science Publishers S.A. v. American Inst. of Physics*, 859 F.Supp. 1521, 1536 (S.D.N.Y.1994); *see also Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996); *Brown v. Armstrong*, 957 F.Supp. 1293, 1302 (D.Mass.1997).

The purpose of a recall announcement is "to convey: (1)[t]hat the product in question is subject to recall; (2)[t]hat further distribution or use of any remaining product should cease immediately; (3)[w]here appropriate, that the direct account should in turn notify its customers who received the product about the recall; [and] (4)[i]nstructions regarding what to do with the product." [30] 21 C.F.R. § 7.49(a). FDA regulations require that recall communications "[b]e brief and to the point [and][e]xplain concisely the reason for the recall" and "not contain irrelevant qualifications, promotional materials, or any other statement that may detract from the message." 21 C.F.R. § 7.49(c).[31]

■ The announcement of the withdrawal of Opos' AADA and the recall notice do not constitute commercial advertising or promotion because they are not designed to influence customers to purchase defendant's goods. *See Gordon & Breach*, 859 F.Supp. at 1536. On the contrary, they are intended to inform consumers that the goods will no longer be available for sale. Furthermore, the recall notices complied with the FDA regulations. The notices announced that all shipments of bulk cefaclor into the United States would temporarily cease. The notices informed purchasers that further distribution of unprocessed lots of cefaclor should cease immediately. See 21 C.F.R. § 7.49(c). Furthermore, the recall notices did not contain any promotional materials or statements to detract from the recall message. *See id.*

Lilly has failed to state a claim under section 43(a) of the Lanham Act. Accordingly, Counts I and III are dismissed.

---

stead should follow an earlier decision by Judge Bissell, *Barr Lab. Inc. v. Bolar Pharm. Co.*, No. 91 Civ. 4374 (D.N.J. July 13, 1992) (*"Bolar"*). This Court is not persuaded by Judge Bissell's decision in *Bolar*. First, *Bolar* was decided prior to *Mylan*, which while not controlling, provided an extensive analysis of this issue. Second, *Bolar* is consistent with *Mylan* and *Barr Lab. II* because it upheld a Lanham Act claim where defendant misrepresented a comparison between the generic drug and the brand name drug. The plaintiff in *Bolar* alleged that defendant "falsely represented that its drug products were bona fide generic substitutes." *Id.* at 20. However, Lilly has not alleged that defendants falsely represented that Opos cefaclor was the bioequivalent of CECLOR. Furthermore, Judge Bissell did not address the issue of whether the Court should allow a private plaintiff to use the Lanham Act to independently enforce the FDCA.

30. Defense counsel represented at oral argument that the FDA reviewed the recall notices prior to their issuance. Although noted, this fact is not critical to the Court's determination and is outside the four corners of the Complaint. As such, the Court shall disregard it.

31. The crux of Lilly's claim is that defendants falsely stated the reason for the recall. Although, as noted, such a falsehood, if proven, would be a violation of the FDA regulations, it does not satisfy the Lanham Act requirements noted above.

## C. Section 44(h) of the Lanham Act (Count V)

Count V alleges that the conduct of the Roussel Defendants and Opos constitutes unfair competition under the Paris Convention for the Protection of Industrial Property of March 20, 1883, 21 U.S.T. 1583, as amended on September 28, 1979 ("Paris Convention") entitling Lilly to relief under Section 44(h) of the Lanham Act, specifically 15 U.S.C. § 1126(b), (h) and/or (i).

The purpose of § 44 of the Lanham Act is "to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations." 15 U.S.C. § 1127. Lilly argues that section 44(h) of the Lanham Act provides it with a cause of action based upon the substantive provisions of the Paris Convention, including its provision concerning unfair competition. Under the Paris Convention, unfair competition includes "any act of competition contrary to honest practices in industrial or commercial matters." [32] Paris Convention, art. 10 bis, 21 U.S.T. 1583. As such

the protections of the Paris Convention are not premised upon the narrow meaning of unfair competition as it was understood under American common law, but adopts the more liberal construction of the European countries such as France, ... The statement that unfair competition is competition 'contrary to honest practice' is not a definition; it merely expresses the concept that a particular act of competition is to be condemned as unfair because it is inconsistent with currently accepted standards of honest practice. It impliedly affirms that unfair competition is too broad a concept to be limited to any narrow definition such as for instance, passing off.

*General Motors Corp. v. Lopez de Arriortua,* 948 F.Supp. 684, 687–88 (E.D.Mich.1996) (quoting 4A Rudolph Callman, The Law of Unfair Competition, Trademarks and Monopolies, § 2610 (4th ed.1994)).

The Lanham Act incorporates the Paris Convention.[33] Section 44 provides that:

Any person whose country of origin is a party to any convention or treaty relating to trademarks ... or the repression of unfair competition, to which the United States is also a party ... shall be entitled to the benefits of this section ... to the extent necessary to give effect to any provision of such convention [or] treaty, in addition to the rights to which any owner of a mark is otherwise entitled by [the Lanham Act].

15 U.S.C. § 1126(b).[34] Section 44 protects foreign nationals against unfair competition:

Any person designated in subsection (b) of this section as entitled to the benefits and subject to the provisions of this chapter shall be entitled to effective protection against unfair competition, and the remedies provided in this chapter for infringement of marks shall be available so far as they may be appropriate in repressing acts of unfair competition.

15 U.S.C. § 1126(h). Section 44 also states that "[c]itizens or residents of the United States shall have the same benefits as granted by this section to persons described in subsection (b) of this section." 15 U.S.C. § 1126(i).

The issue before the Court is whether section 44 of the Lanham Act incorporates the Paris Convention's broad prohibition against unfair competition. The Courts are divided on this issue. Several courts have held that the Lanham Act confers the substantive protections of the Paris Convention on any party whose country of origin is a signatory of the Paris Convention and thus creates a federal law of unfair competition applicable in international disputes. *See, e.g., General Motors,* 948 F.Supp. at 689–90

---

**32.** Article 10 bis of the Paris Convention also provides that "[t]he countries of the Union are bound to assure to nationals of such countries effective protection against unfair competition." Paris Convention, art. 10 bis, 21 U.S.T. 1583.

**33.** Section 44 "serves to implement the Paris Convention; it does not delineate substantive

rights." *Laboratorios Roldan v. Tex Int'l. Inc.,* 902 F.Supp. 1555, 1568 n. 15 (S.D.Fla.1995).

**34.** The United States and France are signatories to the Paris Convention. *See Maison Lazard et Compagnie v. Manfra, Tordella & Brooks, Inc.,* 585 F.Supp. 1286, 1289 (S.D.N.Y.1984).

& n. 5 (American corporation may invoke protections of the Lanham Act and the Paris Convention based on alleged acts of unfair competition which occurred outside the United States); *Laboratorios Roldan,* 902 F.Supp. at 1568 (Dominican company is entitled to protection from unfair competition under the Lanham Act and the Paris Convention); *Maison Lazard,* 585 F.Supp. at 1289 (French plaintiff may invoke protections of the Lanham Act and the Paris Convention for acts of unfair competition which occurred overseas); *see also Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d 788, 792–93 (9th Cir. 1981) (section 44 incorporated substantive provisions of treaty between the United States and Japan). One court has found that interpreting section 44 merely as extending Lanham Act protection to foreign nationals would render subsection (i), which grants reciprocal rights to United States nationals, superfluous. *General Motors,* 948 F.Supp. at 689.

However, other Courts, including the Third Circuit, have held that the Paris Convention does not provide substantive rights, and section 44 merely extends existing Lanham Act and state law protection to foreign nationals conducting business in the United States. *See L'Aiglon Apparel v. Lana Lobell, Inc.,* 214 F.2d 649, 652 (3d Cir.1954) (in a suit between two Pennsylvania corporations, section 44 did not "create a federal law of unfair competition available to United States citizens one against the other nor does it grant the federal courts any new authority to hear such controversies between citizens."). The Third Circuit interpreted section 44(h) as "merely a design to give United States citizens reciprocal rights against foreign nationals where foreign nationals compete unfairly with them." *Id.* (citations omitted).

The Second Circuit has held that a foreign corporation using its trademark in the United States is accorded extensive protections in the United States against unfair competition by virtue of the United States membership in the Paris Convention. However, "that protection has its source in, and is subject to the limitations of, American law, not the law of the foreign national's own country." *Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633, 640 (2d Cir.1956). Section 44 merely requires that "foreign nationals be given the same protection under the trademark and unfair competition laws of each contracting state as that accorded domestic citizens." *Majorica S.A. v. Majorca Int'l. Ltd.,* 687 F.Supp. 92, 95 (S.D.N.Y.1988) (where Spanish company sued American company, Spanish law was not entitled to application in the United States under the Paris Convention).

Lilly argues that the cases Opos and the Roussel Defendants cite only hold that the Lanham Act does not grant extraterritorial application to the domestic laws of foreign states, but do not address whether the Lanham Act incorporates the substantive provisions of the Paris Convention. However, the Third Circuit has held that section 44 did not "create a federal law of unfair competition available to United States citizens one against the other ..." *L'Aiglon,* 214 F.2d at 652. Lilly argues that *L'Aiglon* is not controlling because that case involved a purely domestic controversy and the instant case involves two foreign defendants. This Court finds that the Third Circuit did not intend to grant an American plaintiff suing foreign corporations (such as Lilly) greater protection against unfair competition than that provided to American plaintiffs suing American corporations. Section 44 does not permit an American plaintiff to invoke the protections of the Paris Convention to bring suit in the United States against a foreign corporation for acts which are not actionable under American law. Thus, section 44 of the Lanham Act does not grant to Lilly any broader substantive rights than does section 43(a). *See Scotch Whisky Ass'n v. Majestic Distilling Co.,* 958 F.2d 594, 597 (4th Cir.1992) ("Section 44(b) of the Lanham Act gives those persons whose country of origin is a party to a treaty relating to unfair competition only those benefits of Section 44 necessary to give effect to the treaty."). Count V is duplicative of Count I (Section 43(a) violations) which the Court dismissed. Accordingly Count V is dismissed.

## D. *RICO (Counts XII–XV)*

Counts XII through XV allege federal and state RICO violations, *see* 18 U.S.C. § 1961, *et seq.,* and N.J. Stat. Ann. § 2C:41–

1, *et seq.*, ("NJ RICO"), against the Roussel Defendants and Opos based on the predicate acts of mail and wire fraud. Lilly's RICO claims arise from the false statements made by Opos and the Roussel Defendants to the FDA in the Opos AADA concerning how and where they would manufacture bulk cefaclor.[35]

*Standing/Proximate Cause*

Title 18 of the United States Code, § 1964(c) provides a private right of action for federal RICO violations. That section provides:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c).[36] Thus, a RICO plaintiff can only recover if he has been injured in his business or property by the conduct constituting the violation. *Sedima, S.P.L.R. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

In order to establish standing to bring a civil suit under RICO, plaintiff must show that "the defendant's violations were a proximate cause of the plaintiff's injury, i.e., that there was a direct relationship between the plaintiff's injury and defendant's injurious conduct." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir.1994) (citations omitted). This requires a showing (1) that the defendant's alleged RICO violation was the "but for" cause of his

injury; and (2) that the violation was the direct or proximate cause of the injury. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 265, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Furthermore, a plaintiff only has standing to pursue a RICO claim if the alleged violations were "a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." *Brittingham v. Mobil Corp.*, 943 F.2d 297, 304 (3d Cir.1991) (citations omitted).

In making a proximate cause determination, the court may take into account "such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection." *Prudential Ins. Co. v. United States Gypsum Co.*, 828 F.Supp. 287, 293 (D.N.J.1993) (citations omitted). Proximate cause is interpreted narrowly in RICO claims. *See, e.g., Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303 (9th Cir.1992); *Interchange State Bank v. Veglia*, 286 N.J.Super. 164, 668 A.2d 465 (App.Div. 1995) (applying *Holmes* to plaintiffs' claims under NJ RICO). The "general rule in fraud cases ... is that you are liable only to an intended victim"; however, the victim need not be the primary victim, only an intended victim. *Matter of EDC, Inc.*, 930 F.2d 1275, 1279 (7th Cir.1991); *Prudential*, 828 F.Supp. at 296.

The Supreme Court recently addressed RICO's causation and injury requirement. *See Holmes*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532. In *Holmes*, the Securities In-

---

**35.** Lilly alleges that Opos made false and misleading statements to the district court in the pending Indiana Action. Lilly further alleges that Opos and the Roussel Defendants committed fraud against Lilly in connection with the Italian Action. In April 1995, in connection with the Italian Action, Lilly obtained the right under Italian law to inspect Opos' manufacturing facility in Milan and to obtain the manufacturing tickets detailing each step in Opos' process for manufacturing cefaclor. Lilly alleges that the manufacturing tickets fraudulently depicted steps that did not take place at Opos' facility and that Opos did not use the process reflected in the manufacturing tickets. Lilly seeks to treat the allegedly fraudulent statements made by Opos and the Roussel Defendants in the Indiana Action and the Italian Action as predicate acts for purposes of its RICO claims in this action. This Lilly may not do. The remedy for any asserted

impproprieties Lilly believes may have occurred in the Indiana Action and Italian Action lie with the district court in Indiana and the Italian courts, respectively. As Judge Haight stated in a similar factual scenario—to permit conduct in a pending action to serve as the basis of a RICO claim would improperly apply the RICO statute, invite forum shopping of a most pernicious sort and would embroil this Court in the supervision and review of proceedings in another federal court and in this case, of a foreign court also. *See Rafferty v. Halprin*, No. 90 Civ. 2751(CSH), 1991 WL 148798, at *7 (S.D.N.Y. July 26, 1991).

**36.** NJ RICO tracks the language of 18 U.S.C. § 1964(c) and confers a private right of action on "[a]ny person damaged in his business or property by reason of a violation of N.J.S. 2C:41–2 ..." N.J. Stat. Ann. § 2C:41–4c.

vestor Protection Corporation ("SIPC"), as receiver of a securities firm bankrupted by the purchase of artificially inflated securities, brought a RICO action against the principals of the issuer alleged to have perpetrated the stock manipulation scheme. *Id.* at 272, 112 S.Ct. 1311. The customers on whose behalf the SIPC brought suit had not purchased the fraudulent securities, but had incurred losses when the securities firm became insolvent and could no longer meet its obligations to these customers.[37] The Court dismissed the RICO action because the fraud alleged did not proximately cause the injury to the SIPC clients. The Court held that the direct [proximate] cause of the clients' injury was the firm's intervening insolvency, not the issuer defendants' fraud. *Id.* at 271, 112 S.Ct. 1311. The Court was concerned in part that "suits by those injured only indirectly would open the door to 'massive and complex damages litigation which would not only burden the courts, but would also undermine the effectiveness of treble damages suits.'" *Id.* at 274, 112 S.Ct. 1311 (quoting *Associated General Contractors,* 459 U.S. at 545, 103 S.Ct. 897).

In addition, the Court imposed the "directness of relationship" requirement because of (1) the difficulty in ascertaining the extent of injuries sustained by plaintiffs who were not direct victims of the racketeering acts; (2) the difficulty in apportioning damages among all plaintiffs who have been indirectly injured in order to avoid multiple recoveries; and (3) "the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269, 112 S.Ct. 1311. The Court further added that "[t]he general tendency of the law, in regards to damages at least, is not to go beyond the first step." *Id.* at 271, 112 S.Ct. 1311 (citations omitted).

Subsequent to the *Holmes* decision, the Third Circuit has addressed RICO's requirements for standing and causation. In *McCarthy v. Recordex Service, Inc.,* 80 F.3d 842 (3d Cir.1996), the plaintiffs were clients of attorneys who had purchased photocopies of clients' hospital records. The plaintiffs asserted RICO claims against the hospital and a copy service provider alleging they conspired to inflate photocopy charges. *Id.* at 845. The defendants had billed plaintiffs' attorneys for the photocopies directly, and the attorneys eventually passed on these costs to plaintiffs. Nonetheless, the Third Circuit held that plaintiffs lacked standing because they were indirect victims. *Id.*

Here, the Complaint alleges that the Roussel Defendants' and Opos' misrepresentations to the FDA enabled them to obtain FDA approval to sell cefaclor in the United States. As a result, Lilly contends, defendants harmed Lilly directly by taking away sales of cefaclor that Lilly would have made. Defendants moved to dismiss Lilly's RICO claims because Lilly had not established that its injury was the direct and proximate result of the alleged RICO violations.

The Eastern District of New York rejected a RICO claim in a similar action brought by a drug manufacturer against a competitor (Quantum) based on the submission of false information to the FDA in its abbreviated new drug application. *See Barr Lab. I,* 827 F.Supp. 111. In *Barr Lab. I,* the FDA rescinded Quantum's approval to market its generic drug. Barr sued Quantum alleging that it would have sold more of its own generic drug product had Quantum not fraudulently obtained approval to market its competing drug. The Court held that the alleged predicate acts, mail and wire fraud were not the proximate cause of Barr's injury because Barr's losses depended on the intervening actions of the FDA and Quantum's customers. *Id.* at 116. The Court stated that the FDA had discretion to decide whether or not to approve Quantum's application and Quantum's customers could choose to purchase Quantum's products or any other manufacturer's products. *Id.* On reconsideration, the Court added: "In this case the injured party is the FDA and though Barr was injured because of the injury done to the FDA, its injuries are indirect and remote." *Barr Lab. II,* 1994 U.S. Dist. LEXIS 2197 at *21.

---

**37.** The SIPC has a statutory duty pursuant to the Securities Investor Protection Act to advance funds to the customers of broker/dealers unable to meet their financial obligations.

This Court finds the reasoning of *Barr Lab. I* and *Barr Lab. II* persuasive. In the instant case, any injury sustained by Lilly is indirect and remote. The alleged predicate acts were not the proximate cause of Lilly's injuries because its losses do not stem from Opos' alleged misrepresentations to the FDA. Lilly's injury results from many intervening acts and causes. As noted by the court in *Barr Lab. II*, numerous events had to occur before defendants' acts caused Lilly to lose sales: (1) the FDA had to approve the AADA for Opos cefaclor; (2) Opos had to manufacture sufficient quantities of bulk cefaclor for commercial distribution; (3) AHP, Zenith and Rugby had to purchase Opos cefaclor and manufacture retail dosage units of cefaclor; (4) pharmacies had to stock the product and doctors had to prescribe Opos' generic cefaclor instead of Lilly's CECLOR; and (5) consumers had to decide to purchase finished cefaclor products manufactured by AHP, Zenith or Rugby instead of purchasing Lilly's generic cefaclor or CECLOR.[38] *See Barr Lab. II*, 1994 LEXIS 2197 at *13; *see, e.g., Lifschultz Fast Freight, Inc. v. Consolidated Freightways Corp.*, 805 F.Supp. 1277 (D.S.C.1992), *aff'd*, 998 F.2d 1009 (4th Cir. 1993) (rejecting RICO claim for lost profits based on alleged price-setting conspiracy because "any harm from the alleged conspiracy would be purely contingent on how the rate bureaus and the ICC [Interstate Commerce Commission] acted based on the alleged predicate acts and then the consumers taking action based on the ICC action."); *Veglia*, 286 N.J.Super. at 182, 668 A.2d 465 (following *Holmes* and denying New Jersey RICO claims for lack of proximate cause since the alleged injury was "several steps removed from the predicate acts of fraud and forgery"); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786 (1st Cir.1990)

(affirming dismissal of RICO claim because plaintiff failed to establish a direct relationship between fraudulent submission to regulatory agency and asserted injury).

Lilly has alleged that "but for" the fraudulent statements in Opos' AADA, Lilly would have made all cefaclor sales that Opos made. However, due to the many intervening acts specified above, Lilly is an indirect victim of the alleged fraud to the FDA and therefore does not have standing to assert a claim under RICO.

Lilly argues that this Court should not follow *Barr Lab. II* because in that case there were many competitors in the marketplace, whereas in this case, Lilly was the sole drug manufacturer approved by the FDA to market cefaclor. Therefore, Lilly argues, every sale made by Opos and the Roussel Defendants was a sale Lilly would have made. However, the fact that prior to the FDA's approval of Opos' AADA, Lilly was the only manufacturer of cefaclor does not change the fact that numerous intervening factors had to transpire before Lilly lost sales. Accordingly, Lilly's claims under §§ 1962(a) and (c) must be dismissed because it cannot show proximate cause.

Even though Lilly lacks standing to pursue its claims under §§ 1962(a) and (c) because its injury did not directly result from the violation of these subsections, violations of these sections can still serve as the basis of a § 1962(d) conspiracy claim provided the acts alleged do violate §§ 1962(a) or (c). *See Rehkop v. Berwick Healthcare Corp.*, 95 F.3d 285, 290 (3d Cir.1996) (upholding the district court's dismissal of plaintiff's § 1962(c), but finding that plaintiff's alleged violation of § 1962(c) could serve as the object of a § 1962(d) conspiracy). *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162 (3d Cir. 1989).[39] Section 1962(d) provides that "[i]t

---

38. Lilly asserts that its RICO claims are not based only on the Roussel Defendants' misrepresentations to the FDA, but on the misrepresentations and fraud aimed directly at Lilly. However, Lilly does not even attempt to explain how the misrepresentations to Lilly directly or indirectly harmed Lilly. Lilly only alleges that the fraudulent scheme enabled Opos and the Roussel Defendants to obtain FDA approval and take sales away from Lilly. *See* Complaint ¶ 136 (alleging that the Roussel Defendants engaged in "a pattern of racketeering activity by ... executing an

unlawful and fraudulent scheme to obtain FDA approval of Opos cefaclor and thereby enable the RICO defendants to compete unlawfully with Lilly in the manufacture and sale of cefaclor ...")

39. In *Shearin*, the plaintiff (a whistle-blower) alleged that defendants terminated her from her job in furtherance of a RICO conspiracy. Shearin alleged violations of §§ 1962(a), (c) and (d). She asserted that defendants caused her injury by hiring her away from her previous job and then firing her when she refused to "play the

shall be unlawful for any person to conspire to violate any of the provisions of sub-sections (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

Thus, to assert conspiracy to violate §§ 1962(a) or (c), Lilly must establish that the Roussel Defendants violated, or conspired to violate, one of these subsections and that it was harmed by the conspiracy.[40] *Rehkop*, 95 F.3d at 290. A plaintiff's allegation that it was harmed in furtherance of a conspiracy under § 1962(d) states a claim for relief under § 1964(c). *Id.* To determine whether Lilly has stated a claim of conspiracy under § 1962(d), the Court must first determine whether Lilly's allegations state a violation of §§ 1962(a) or (c).[41]

Count XII alleges that the Roussel Defendants violated sections 1962(a), (c) and (d) by fraudulently obtaining FDA approval of Opos cefaclor thereby enabling them to compete unlawfully with Lilly in the manufacture and sale of cefaclor in the United States. Lilly avers that Opos is the enterprise and the Roussel Defendants are the defendant persons. The purported predicate acts are mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343.

*Section 1962(a)*

Section 1962(a) provides in pertinent part: It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). Section 1962(a) "was primarily directed at halting the investment of racketeering proceeds into legitimate businesses, including the practice of money laundering." *Lightning Lube*, 4 F.3d at 1188 (quoting *Brittingham*, 943 F.2d at 303.) *See also* Gerard E. Lynch, *RICO; The Crime of Being a Criminal*, 87 Colum. L.Rev. 661, 681 (1987) (§ 1962(a) is specifically designed to prevent the "acquisition of an interest in a legitimate business by the investment of 'dirty money' derived from racketeering.")

Under § 1962(a), a plaintiff must allege that (1) defendants received money from a pattern of racketeering activity; (2) defendants invested that money in an enterprise;

good soldier." *Id.* at 1168. The Third Circuit held that Shearin had failed to plead injury resulting from defendants' violation of §§ 1962(a) or (c) because her job loss did not result from violations of these subsections or the predicate acts necessary to establish them. *Id.* at 1167–68. The Court stated that if defendants' predicate acts under §§ 1962(a) or (c) injured anybody, they injured their own customers whom the securities scheme defrauded. *Id.* at 1168. Although Shearin lacked standing to pursue a civil RICO remedy for violations of §§ 1962(a) or (c), the Court held that she had standing to bring an action for conspiracy under § 1962(d). *Id.* "[W]hile the section 1962(a) and (c) violations she alleges injured only customers, that is not so with respect to the alleged section 1962(d) conspiracy." *Id.* The Court held that Shearin's contentions that defendants "hired her as window dressing to perpetuate the fraud that it was a legitimate company" and her contention that she "was fired to preserve the same fraud when she would not participate" qualified as predicate acts under § 1962(d). *Id.* Accordingly, the Court held, Shearin's hiring and firing plausibly constituted overt acts that could establish a conspiracy and "[a]ssuming that the hiring and firing were injuries, those injuries did occur 'by reason of' [defendants'] violation of section 1962(d)." *Id.* at 1168–69.

**40.** The Third Circuit has acknowledged that most courts including the First, Second, Eighth and Ninth Circuits, have disagreed with *Shearin* and have held that only injuries caused by RICO predicate acts provide standing to sue for conspiracy. *Rehkop*, 95 F.3d at 290 & n. 6. However, as stated by *Rehkop* Court, it "need not defend *Shearin* ... [i]t is the law of this circuit." 95 F.3d at 290.

**41.** Opos and the Roussel Defendants cite *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir.1993), for the proposition that the failure of Lilly's allegations with respect to §§ 1962(a) and (c) also requires a dismissal of Lilly's claim under § 1962(d). However, as stated by the Third Circuit in *Rehkop*, 95 F.3d at 290, *Lightning Lube* merely held that to state a violation of § 1962(d) for conspiracy to violate §§ 1962(a), (b) or (c), the plaintiff must establish that defendants violated or were going to violate one of those subsections. 95 F.3d at 290. The problem in *Lightning Lube* was that the actions alleged to constitute violations of §§ 1962(a), (b) or (c) were not violations of these subsections and thus they failed to serve as the object of a § 1962(d) conspiracy. *Rehkop*, 95 F.3d at 290.

and (3) the enterprise affected interstate commerce. *Lightning Lube,* 4 F.3d at 1188. In addition, the plaintiff must allege an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves. *Id.* (citing *Glessner v. Kenny,* 952 F.2d 702, 708 (3d Cir.1991)); *see also Brittingham,* 943 F.2d at 303–04 (" § 1962(a) is directed specifically at the use or investment of racketeering income, and requires that a plaintiff's injury be caused by the use or investment of income in the enterprise"); *Rose v. Bartle,* 871 F.2d 331, 357–58 (3d Cir.1989) (affirming dismissal on same basis).

 Count XII alleges that the Roussel Defendants received income from the sale of Opos' cefaclor which they used or reinvested in the operation of Opos (the enterprise), in violation of § 1962(a). Complaint ¶ 137. These allegations do not state a claim under § 1962(a) because they fail to explain how Lilly was injured by the use or investment of the racketeering income as opposed to by the racketeering acts themselves. *See Lightning Lube,* 4 F.3d at 1188. Instead, Lilly's 1962(a) allegations merely "repeat the crux of its allegations in regard to the pattern of racketeering," *id.;* namely that the Roussel Defendants fraudulently obtained FDA approval to manufacture and sell cefaclor, thereby enabling them to compete unlawfully with Lilly. This is insufficient to state a claim under § 1962(a) because Lilly has "neither alleged nor demonstrated a connection with the use or investment of racketeering income other than the normal reinvestment of corporate profits." *Brittingham,* 943 F.2d at 305. As the Third Circuit stated in *Brittingham:*

> If this remote connection were to suffice, the use-or-investment injury requirement would be almost completely eviscerated when the alleged pattern of racketeering is committed on behalf of a corporation.... Over the long term, corporations generally reinvest their profits, regardless of the source. Consequently, almost every racketeering act by a corporation will have

some connection to the proceeds of a previous act. § 1962(c) is the proper avenue to redress injuries caused by the racketeering acts themselves. If plaintiffs' reinvestment injury concept were accepted, almost every pattern of racketeering activity by a corporation would be actionable under § 1962(a), and the distinction between § 1962(a) and § 1962(c) would become meaningless.

943 F.2d at 305; *see also Lightning Lube,* 4 F.3d at 1188–89 (allegation that the use and reinvestment of racketeering income allowed defendant to continue to injure plaintiff was insufficient to state a § 1962(a) claim). Lilly's alleged injury, lost sales, may have arisen from a pattern of racketeering but not from the investment of racketeering income. Accordingly, Lilly has failed to state a claim under § 1962(a).[42]

### *Section 1962(c)*

 Section 1962(c) prohibits:
> any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Section 1962(c) draws a clear distinction between the defendant "person" and the "enterprise". Accordingly, the defendant person charged with violating § 1962(c) cannot be the same entity as the alleged enterprise. *B.F. Hirsch v. Enright Refining Co.,* 751 F.2d 628, 633 (3d Cir.1984).

This rule has been applied to preclude a plaintiff from naming a subsidiary as the defendant enterprise and its parent corporation as the defendant person, unless the plaintiff has pleaded facts showing that the parent took a separate and distinct role in the alleged racketeering activity. *See, e.g., Brittingham,* 943 F.2d at 302 ("Without additional allegations, ... a subsidiary corporation cannot constitute the enterprise through

---

**42.** In its brief, Lilly asserts that its allegation states a claim that the Roussel Defendants set up and operated Opos as a front for the purpose of conducting fraud. *See* Pl's. Br. Opp. to Mot. to Dismiss, at p. 49. The Complaint, however, does not contain any allegations that the Roussel Defendants operated Opos as a front or that Opos was merely a shell corporation. On a motion to dismiss, the Court is bound by the Complaint; therefore, the Court must disregard this allegation.

which a defendant parent corporation conducts a racketeering enterprise ... [C]laims will be dismissed when the enterprise and defendant, although facially distinct, are in reality no different from each other."); *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1412 (3d Cir.1993) (affirming dismissal of a § 1962(c) claim alleging that a parent corporation and its wholly-owned subsidiary had conducted the affairs of a second-tier subsidiary "enterprise" through a pattern of racketeering activity; "the plaintiff must plead facts which, if assumed to be true, would clearly show that the parent corporation played a role in the racketeering activity which is distinct from the activities of its subsidiary.").

Merely alleging that the subsidiary conducted its activities fraudulently is insufficient to establish that the parent and the subsidiary are distinct. *Glessner*, 952 F.2d at 712 n. 10 (plaintiff's attempt to establish distinctiveness between parent and subsidiary by alleging that "fraudulently marketing [the product] was clearly outside their corporate [and normal] course of business" was merely a semantic device and did "not represent a distinction of substance."). Furthermore, a parent corporation's receipt of a benefit, whether direct or indirect, from its subsidiaries' activities cannot suffice to state a § 1962(c) claim. *See Lorenz*, 1 F.3d at 1412–13. ("A parent company normally can be expected to benefit from the subsidiary, it does not matter whether that benefit can be characterized as direct or indirect. For purposes of stating a § 1962(c) claim, it does not matter whether that benefit can be characterized as direct or indirect.")

### Opos as the Enterprise

Count XII alleges that the Roussel Defendants "directly or indirectly conducted and participated in the affairs of Opos by means of a pattern of racketeering activity" by fraudulently obtaining FDA approval of Opos cefaclor and thereby enabling the Roussel "Defendants to compete unlawfully with Lilly in the manufacture and sale of cefaclor in the United States", in violation of section 1962(c). Complaint ¶ 136. Lilly avers that Opos is the enterprise and the Roussel Defendants are the defendant persons. Complaint ¶ 135.

Lilly has not pleaded any facts showing that Roussel–France (the parent) or any of its subsidiaries (RU Holdings and Roussel Corp.) and affiliates (HMRI), named as defendant persons, played a role in the alleged pattern of racketeering which is distinct from Opos' (the enterprise) role. In fact, throughout the Complaint, Lilly has repeatedly alleged that the Roussel Defendants and Opos acted in concert. *See* Complaint ¶¶ 19, 33, 34, 39–40 and 44–45. For example, Lilly alleged that Opos and Roussel Corp., in concert with and directed by Roussel–France, RU Holdings and HMRI, caused cefaclor to be imported into the United States. *Id.* ¶ 19. Lilly further alleged that the Roussel Defendants and Opos through Roussel–France, RU Holdings and Roussel Corp. solicited Lilly to purchase bulk cefaclor. *Id.* ¶ 34. Lilly asserted that the Opos and the Roussel Defendants, acting through Opos, submitted the AADA to the FDA. *Id.* ¶ 39. Count XII clearly fails to satisfy the distinctiveness requirement.[43] Accordingly,

---

**43.** Lilly claims that *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258 (3d Cir.1995), overruled the distinctiveness requirement and a plaintiff need only allege that there is a legal distinction between the defendant persons and the enterprise to satisfy the requirement of § 1962(c). This Court disagrees. In *Jaguar Cars,* the Third Circuit only decided whether corporate officers and directors may be considered distinct from their corporation for purposes of § 1962(c). The Court held that "the distinctiveness requirement of § 1962(c) to corporate officers and directors does not survive [the Supreme Court's decisions in] *Reves* and *Scheidler,* and because we are, therefore, satisfied that corporate officers/employees, such as the defendants may properly be held liable as persons managing the affairs of their corporation as an enterprise through a pattern of racketeering activity, we

will affirm." *Id.* at 261. The Court did not address or consider the application of the distinctiveness requirement to a parent corporation and its subsidiaries or affiliates.

Lilly contends that the relationship of an officer or director to his or her corporation is directly analogous to the relationship of a corporate parent or affiliate to its subsidiary; therefore, *Jaguar Cars* is controlling in this case. However, even after its decision in *Jaguar Cars,* the Third Circuit affirmed a case holding that a corporation is not distinct from an enterprise that included its subsidiaries and affiliates. *See Metcalf v. PaineWebber, Inc.*, 886 F.Supp. 503, 513–14 & n. 12 (W.D.Pa.1995) (construing *Jaguar Cars* as limited to distinctiveness issues related to corporate officers and employees), *aff'd without op.*, 79 F.3d 1138 (3d Cir.1996) (table); *see also Brannon v. Boatmen's Bancshares, Inc.*, 952 F.Supp.

Lilly's § 1962(c) claim, as alleged in Count XII is dismissed.

### FDA as the Enterprise

■ Count XIII asserts an alternative § 1962(c) claim in which the FDA is the enterprise and Opos and the Roussel Defendants are the defendant persons. Courts in this and other circuits have recognized that a public entity may serve as the enterprise where defendants engage in "patterns of racketeering activity to corrupt the operation of the" governmental agencies. *See Averbach v. Rival Mfg. Co.*, 809 F.2d 1016 (3d Cir.1987) (a court may be the named enterprise in a RICO action); *United States v. Frumento*, 563 F.2d 1083, 1089–92 (3d Cir. 1977) (the Pennsylvania Bureau of Cigarettes and Beverage Taxes as the enterprise); *United States v. Angelilli*, 660 F.2d 23, 33 (2d Cir.1981) (New York City Civil Court as the enterprise); *United States v. Baker*, 617 F.2d 1060, 1061 (4th Cir.1980) (County Sheriff's office as the enterprise); *Barr Lab. v. Bolar Pharm. Co.*, No. 91 Civ. 4374 (D.N.J. July 13, 1992) ("Bolar") (FDA as the RICO enterprise).

■ To state a claim under § 1962(c), a plaintiff must allege not only that the defendants were "employed or associated with" an enterprise within the meaning of the statute, but also that defendants "conduct[ed] or participat[ed], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(c) requires that plaintiff allege that defendant participated in the operation or management of the enterprise itself. *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Thus, RICO claims under § 1962(c) may not be asserted against "outsiders" who lack a role in the operation or management of the alleged enterprise. *Id.* at 185, 113 S.Ct. 1163. Section "1962(c) can-

not be interpreted to reach complete 'outsiders' because liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." *Id.*[44]

In *Reves*, a trustee in bankruptcy brought a civil RICO action on behalf of certain noteholders against the independent accountants who had performed two year-end audits of the issuer of the notes, a farmers' cooperative. Plaintiff alleged the accountants failed to disclose that certain assets were assigned a fixed-asset value rather than a lower fair-market value. The Supreme Court rejected the plaintiff's contention that by preparing the cooperative's financial statements, the accountants had participated in the operation or management of the cooperative. *Id.* at 186, 113 S.Ct. 1163. The Court further rejected plaintiff's arguments that the accountants' failure to inform the cooperative's board that they should have used a fair market valuation constituted participation in the operation or management of the cooperative or gave rise to liability under § 1962(c). *Id.*

Lilly alleges that Opos and the "Roussel Defendants directly or indirectly conducted, influenced and participated in the affairs of the FDA by means of a pattern of racketeering activity by ... devising ... [a] fraudulent scheme to obtain FDA approval of Opos cefaclor and thereby enable [them] to compete unlawfully with Lilly in the manufacture and sale of cefaclor in the United States ...", in violation of § 1962(c). Complaint ¶ 142. Lilly further alleges that Opos and the Roussel Defendants directed or controlled the outcome of the FDA approval process by filing fraudulent documents in support of the Opos AADA and by creating fraudulent manufacturing processes and records to show the FDA when it inspected Opos' facility in Milan. Complaint ¶¶ 39–44, 141–42 and 153.

---

1478, 1486–87 (W.D.Okla.1997) (construing *Jaguar Cars* similarly and noting that *Metcalf*, 886 F.Supp. at 513–14 refused to extend the holding in *Jaguar Cars* to corporate entities). The Third Circuit affirmed the district court's decision in *Metcalf*. As such, *Metcalf* is the law of this circuit as it pertains to corporate entities.

**44.** Outsiders may be liable if they exerted control over the enterprise "as, for example, by bribery".

*See, e.g., Reves*, 507 U.S. at 184, 113 S.Ct. 1163. *Mylan Lab., Inc. v. Akzo, N.V.*, 770 F.Supp. 1053, 1061 (D.Md.1991) (allowing plaintiff to plead the FDA as the RICO enterprise where defendants allegedly bribed FDA officials to dispose favorably of their submissions to the agency). However, Lilly has not alleged that any FDA employees were aware of, or participated in Opos' and the Roussel Defendants'· alleged scheme to defraud the FDA.

These allegations are defective under *Reves*. Lilly has failed to allege any facts by which Opos and the Roussel Defendants—complete outsiders to the FDA—participated in the operation or management of the FDA. *See Averbach*, 809 F.2d at 1018 (affirming dismissal of § 1962(c) claims premised on the defendant's submission of false interrogatory answers that allegedly corrupted the district court, the RICO enterprise).[45] As in *Averbach*, if Lilly's "allegations are true, no more occurred with respect to the enterprise in question [the FDA] than to mislead those who conducted it. That is not, in our view, equivalent to the participation in its affairs which is required" by § 1962(c). *Averbach*, 809 F.2d at 1018. Accordingly, Lilly's § 1962(c) claim, as alleged in Count XIII is dismissed.[46]

### Section 1962(d)

The viability of Lilly's § 1962(d) claim depends on the legal sufficiency of its §§ 1962(a) or (c) claims. *See Jaguar Cars*, 46 F.3d at 262. Lilly has failed to assert successfully violations of §§ 1962(a) or (c). Accordingly, its claim for conspiracy under § 1962(d) is dismissed and Counts XII and XIII are dismissed.

### Counts XIV and XV

Count XIV alleges that the Roussel Defendants "directly or indirectly conducted and participated in the affairs of Opos by means of a pattern of racketeering activity" by fraudulently obtaining FDA approval of Opos cefaclor and thereby enabling the Roussel "Defendants to compete unlawfully with Lilly in the manufacture and sale of cefaclor in the United States", in violation of

NJ RICO § 2C:41–2c. Complaint ¶ 147. Lilly avers that Opos is the enterprise and the Roussel Defendants are the defendant persons. Complaint ¶ 146. The language of § 2C:41–2c "borrows its structure, purpose and remedies from Federal RICO ..."[47] *State v. Ball*, 268 N.J.Super. 72, 98, 632 A.2d 1222 (App.Div.1993). However, the New Jersey courts have recently held that there is no requirement under section 2C:41–2c that the enterprise and the defendant persons be distinct as required under federal RICO. *See Maxim Sewerage Corp. v. Monmouth Ridings*, 273 N.J.Super. 84, 96, 640 A.2d 1216 (Law Div.1993) (citing *Ball*, 268 N.J.Super. at 143–44, 632 A.2d 1222) ("the broader definition of "person" under N.J. RICO eliminates the *Enright* distinctiveness requirement"); *Ball*, 268 N.J.Super. at 143–44, 632 A.2d 1222 ("We go so far as to hold that the 'enterprise' element is satisfied if the 'enterprise' is no more than the sum of the racketeering acts"). Since there is no distinctiveness requirement under NJ RICO, Lilly's claim under § 2C:41–2c is legally sufficient. However, even though Lilly has asserted violations of § 2C:41–2c, under *Holmes*, it lacks standing to bring a civil RICO action. *See supra*, pp. 482–484; *Holmes*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532; *Veglia*, 286 N.J.Super. at 178–83, 668 A.2d 465.

Lilly also alleges that the Roussel Defendants received substantial income from the sale of cefaclor which they reinvested in Opos, the enterprise, in violation of NJ RICO § 2C:41–2a. Complaint ¶ 148. However, the Court shall not analyze the legal sufficiency of Lilly's claims under § 2C:41–2a because under *Holmes*, it lacks standing to bring a

---

45. The *Averbach* Court distinguished the situation before it from one in which *insiders* sought to corrupt the operation of a court system. "In those instances in which courts have been recognized as RICO enterprises, ... the participants engaged in patterns of activities designed to corrupt the operation of the courts own processes." *Averbach*, 809 F.2d at 1018.

46. Lilly asserts that this Court should follow *Bolar*, No. 91 Civ. 4374, at 17, and *Mylan*, 770 F.Supp. at 1061. In those cases, the courts upheld plaintiffs' § 1962(c) claims where plaintiff pleaded the FDA as the enterprise. The instant case is distinguishable because the plaintiffs in *Mylan* and *Bolar* alleged that defendants bribed FDA officials to approve their applica-

tions. As stated in *Reves*, 507 U.S. at 184, 113 S.Ct. 1163, outsiders may be liable if they exerted control over the enterprise by bribery. Here, Lilly has not pleaded any facts showing that Opos or the Roussel Defendants bribed any FDA officials or corrupted the FDA's internal processes.

47. N.J. Stat. Ann. § 2C:41–2c prohibits:

any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

civil RICO action. *See supra,* pp. 482–484; *see also Holmes,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532; *Veglia,* 286 N.J.Super. at 178–83, 668 A.2d 465. Accordingly, Lilly's claims under §§ 2C:41–2a and 2C:41–2c are dismissed.

Count XIV also alleges that the Roussel Defendants conspired to violate NJ RICO § 2C:41–2a and 2C:41–2c, in violation of § 2C:41–2d. Complaint ¶ 149. Section 2C:41–2d provides that "it shall be unlawful for any person to conspire as defined by N.J.S. 2C:5–2 to violate any of the provisions of this section." N.J. Stat. Ann. § 2C:41–2d N.J. Stat. § 2C:5–2 provides in relevant part that:

> A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:
> (1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime;

To assert a claim of conspiracy under NJ RICO, the plaintiff must allege that the defendant agreed "that he or other members of the conspiracy will commit two racketeering acts, with knowledge of the unlawful objective and the intention to further that objective." *Maxim Sewerage,* 273 N.J.Super. at 101, 640 A.2d 1216.

▮ Lilly alleges the Roussel Defendants conspired to obtain FDA approval of Opos cefaclor and thereby enable them to compete unlawfully with Lilly. Complaint ¶¶ 53, 136, 142 and 147. Lilly also asserts the Roussel Defendants committed mail and wire fraud in furtherance of the conspiracy. Lilly further alleges that the Roussel Defendants committed the predicate acts "with the agreement, knowledge, acquiescence and approval of all the Roussel Defendants as part of a conspiracy." Id. ¶ 45. These allegations are suffi-

cient to state a claim of conspiracy under section 2C:41–2d.[48]

### E. *Common Law Fraud (Count VI)*

▮ Fed.R.Civ.P. 9(b) provides that when pleading a cause of action for fraud, "the circumstances constituting fraud ... shall be stated with particularity." Rule 9(b) is designed to place defendants on notice of the precise misconduct that is alleged and to protect the reputation of defendants by safeguarding them against spurious allegations of immoral and fraudulent conduct. *See Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984); *Gutman v. Howard Sav. Bank,* 748 F.Supp. 254, 257 (D.N.J.1990).

▮ The requirements of Rule 9(b) may be satisfied if the complaint describes the circumstances of the alleged fraud with precise allegations of date, time or place. *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 645 (3d Cir.1989) (citing *Seville,* 742 F.2d at 791). Alternatively, plaintiffs must use some means of "injecting precision and some measure of substantiation into their allegations of fraud." *Seville,* 742 F.2d at 791 (holding that the plaintiff satisfied Rule 9(b) "by incorporating into the complaint a list identifying with great specificity the pieces of machinery that were the subject of the alleged fraud"); *see also Saporito v. Combustion Eng'g, Inc.,* 843 F.2d 666, 675 (3d Cir.1988), *vacated on other grounds,* 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989) (Rule 9(b) requires "detailed allegations" of fraud). Plaintiff must also supply a factual basis for allegations of scienter which "give rise to a 'strong inference' that the defendants possessed the requisite intent." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir.1997); *see also Pell v. Weinstein,* 759 F.Supp. 1107, 1117 (M.D.Pa.1991) (applying

---

48. In the alternative to Count XIV, Lilly asserts Count XV. Lilly's Complaint makes the same allegations under Count XV as under Count XIV, except that in Count XV it alleges that the FDA is the enterprise and Opos and the Roussel Defendants are the defendant persons. The Court need not analyze the merits of Lilly's claims as alleged in Count XV because even if its claims under §§ 2C:41–2a and 2C:41–2c were legally sufficient, Lilly could not recover damages under *Holmes. See supra,* pp. 482–484; *see also Holmes,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532; *Veglia,* 286 N.J.Super. at 173–64, 668 A.2d 465. Since the Court has held that Lilly stated a claim for conspiracy as alleged in Count XIV, the claim for conspiracy under the alternative Count XV is dismissed as moot.

heightened Rule 9(b) standard in civil RICO action).

■ In addition, a plaintiff must plead predicate acts with particularity with respect to each defendant, thereby informing each defendant of the nature of its alleged participation in the fraud. *See, e.g., Seville,* 742 F.2d at 791. "Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'" *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993); *Strange v. Nationwide Mut. Ins. Co.,* 867 F.Supp. 1209, 1220 (E.D.Pa.1994) (pleading which alleged that defendants' agents made fraudulent representations did not satisfy particularity requirements of Rule 9(b)); *see also Jackson Nat'l Life Ins. Co. v. Ligator,* 949 F.Supp. 200, 208 (S.D.N.Y.1996) (branding the plaintiffs' failure to distinguish among the "Ligator Defendants" as an egregious example of prohibited "group pleading" under Rule 9(b)).

■ However, the Third Circuit has held that the requirements of Rule 9(b) may be relaxed where factual information is exclusively within the opposing party's knowledge or control. *Craftmatic,* 890 F.2d at 645. Nonetheless, even under a non-restrictive application of Rule 9(b), plaintiff must allege that the necessary information lies within defendants' control and their allegations must be accompanied by a statement of facts upon which the allegations are based. *Id.*

■ The elements of a claim for common law fraud in New Jersey are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon; and (5) resulting damages. *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610, 691 A.2d 350 (1997); *see also McDonald's Corp. v. Miller,* Civ. A. No. 92–4811, 1994 WL 507822, *9 (D.N.J. Sept.14, 1994), *aff'd,* 60 F.3d 815 (3d Cir.1995); *Raul Int'l Corp. v. Sealed Power Corp.,* 586 F.Supp. 349, 357 (D.N.J.1984) (citations omitted). A plaintiff can state a claim for fraud based on defendant's alleged misrepresentation to a third party only if the defendant "intend[ed] it to be communicated to and relied upon by the plaintiff." *Parker Preci-*

*sion Prods. Co. v. Metropolitan Life Ins.,* 407 F.2d 1070, 1076 (3d Cir.1969); *see also Judson v. Peoples Bank & Trust Co.,* 25 N.J. 17, 134 A.2d 761 (1957).

The Complaint alleges that Opos and the Roussel Defendants "made false and misleading statements of material fact to the FDA and to Lilly ... with intent to deceive, and with the intent to induce reliance by the FDA and Lilly." Complaint ¶ 115. The Complaint further alleges that the "FDA and Lilly reasonably relied upon the false and misleading statements ... to their detriment." *Id.*

■ Lilly has failed to plead fraud with particularity. The Complaint alleges that in 1990 or 1991, "representatives" of the Roussel Defendants met with "Lilly representatives" and solicited Lilly to purchase bulk cefaclor from Opos and represented to them that Opos' manufacturing process would not infringe Lilly's patents. Complaint ¶¶ 33–34. However, the Complaint does not indicate who the speakers were or to whom they were speaking. In addition, the Complaint jointly attributes all the allegedly fraudulent statements to Opos and the Roussel Defendants and fails to inform each defendant of the nature of its alleged participation in the fraud. *See Seville,* 742 F.2d at 791; *Mills,* 12 F.3d at 1175.

■ Lilly claims that it detrimentally relied on the fraudulent representations that the Roussel Defendants made directly to Lilly. Lilly alleges that in 1990 or 1991, the Roussel Defendants solicited it to purchase bulk cefaclor from Opos and represented that Opos would manufacture the cefaclor at its facility in Milan, Italy. Opos also stated it would use a process which would not infringe on Lilly's patented process. However, the Complaint fails to specify how these statements misled Lilly. Furthermore, it appears to the Court that Lilly cannot contend that it relied upon these representations because Lilly refused to purchase bulk cefaclor from Opos and commenced an infringement action in Indiana as soon as Opos obtained FDA approval to market bulk cefaclor.

■ In its brief in opposition to the motion to dismiss, Lilly asserts that in reliance

on the Roussel Defendant's misrepresentations, it began offering generic cefaclor in 1994, which it would not have done had the Roussel Defendants not deceived it as to the nature of the Opos manufacturing process. *See* Pl's. Br. Opp. to Mot. to Dismiss, at p. 6. However, these allegations are not asserted in the Complaint. Since a "complaint may not be amended by the briefs in opposition to a motion to dismiss", the Court must disregard these allegations. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984); *see also Commonwealth of Pennsylvania v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir.1988) (same).

Lilly also claims that it detrimentally relied upon the Roussel Defendants' fraudulent misrepresentations to the FDA. However, Lilly cannot claim detrimental reliance based on misrepresentations to the FDA unless it alleges that the Roussel Defendants intended to have their statements to the FDA communicated to and relied upon by Lilly. *See Parker*, 407 F.2d at 1076. Lilly has not alleged that it was an intended recipient of the Roussel Defendants' statements to the FDA or that the Roussel Defendants intended to induce Lilly to rely on their statements to the FDA.

Lilly has failed to plead two of the elements of fraud—reasonable reliance and an intent to induce reliance—with the requisite particularity. Accordingly, Count VI is dismissed.

### F. Negligent Misrepresentation (Count VII)

Count VII alleges that Opos and "the Roussel Defendants negligently made false and misleading statements of material fact to the FDA and Lilly ... with the intent to induce reliance by the FDA and Lilly." Complaint ¶ 119. The Complaint further alleges that the "FDA and Lilly reasonably relied upon the false and misleading statements ... to their detriment." *Id.*

Under New Jersey law, to establish a claim of negligent misrepresentation claim, a plaintiff must prove that the defendant negligently made an incorrect statement, upon which the plaintiff justifiably relied. *Alexander v. CIGNA Corp.*, 991 F.Supp. 427, 440 (D.N.J.1998) (citing *H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 334, 461 A.2d 138 (1983)).

Moreover, the plaintiff must show that it was a reasonably foreseeable recipient of defendants' misrepresentation. *See Karu v. Feldman*, 119 N.J. 135, 147, 574 A.2d 420 (1990).

It is unclear which representations Opos and the Roussel Defendants made directly to Lilly that Lilly allegedly relied upon to its detriment. As stated above, Lilly can hardly contend that it reasonably relied upon the alleged misrepresentations the Roussel Defendants made to Lilly in 1990 or 1991 since Lilly refused to purchase bulk cefaclor from Opos. Further, Lilly commenced an infringement action in Indiana as soon as Opos obtained FDA approval to market bulk cefaclor.

Furthermore, Lilly cannot claim detrimental reliance based on misrepresentations to the FDA unless it was the "reasonably foreseeable recipient" of Opos' and the Roussel Defendants' misrepresentations to the FDA. The Opos AADAs were confidential documents. Lilly stated that it has no direct knowledge of any statements defendants made to the FDA. *See* Pl's. Br. Opp. to Mot. to Dismiss, at p. 58. Consequently, Lilly cannot assert that it detrimentally relied on Opos' and the Roussel Defendants' allegedly fraudulent statements to the FDA.

Lilly has not pled any facts showing that it justifiably relied upon Opos' and the Roussel Defendants' alleged misrepresentations. Accordingly, Count VII is dismissed.

### G. Tortious Interference with Business Relations (Count IX)

Count IX of the Complaint alleges that the conduct of Opos and "the Roussel Defendants constitutes tortious interference with business relations between Lilly and others, in the absence of any legal justification." Complaint ¶ 126.

To state a claim for tortious interference with business relationships, a plaintiff must allege that: (1) it had a continuing or prospective economic relationship or reasonable expectation of economic advantage; (2) the defendant knew of such relationship of expectancy; (3) the interference and harm inflicted were done intentionally and with "malice" in the sense of conduct that is

wrongful and without justification or excuse; (4) if not for the interference, it was reasonably probable that plaintiff would have realized its economic advantage; and (5) the plaintiff was injured as a result of defendant's conduct.[49] *See Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 186 (3d Cir.1992); *see also Varrallo v. Hammond, Inc.*, 94 F.3d 842, 848 (3d Cir.1996); *Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751–52, 563 A.2d 31 (1989).

■ Lilly seeks to recover the profits which it might have earned had defendants not fraudulently obtained approval to market Opos cefaclor. However, a plaintiff asserting a tortious interference claim must allege facts that show an existing or prospective economic or contractual relationship; "[a] mere allegation of lost business does not suffice." *Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.*, 801 F.Supp. 1450, 1459 (E.D.Pa.1992). The Complaint must "allege facts that, if true, would give rise to a reasonable probability that particular anticipated contracts would have been entered into." *Id.* Thus, "the claimed loss of ... unknown customers cannot, standing alone, state a claim for tortious interference with prospective business relations." *Id.*

■ Lilly has not alleged that it had existing or potential business relationships with intermediate manufacturers of cefaclor (AHP, Zenith or Rugby) or any third party. *See Barr Laboratories, I*, 827 F.Supp. at 119 (plaintiff drug manufacturer could not recover the profits it may have realized had the competitor's product not been introduced into the marketplace because the competitor did not interfere with plaintiff's ability to market its own product and plaintiff did not allege that the competitor interfered directly with a business relationship between plaintiff and a third party). Lilly also fails to allege the existence of any "particular anticipated contract" with which Opos and the Roussel Defendants allegedly interfered. Furthermore, Lilly has not demonstrated a causal connection between the alleged interference and its loss. Lilly's losses do not arise from

any actions of Opos and the Roussel defendants, but resulted from the intervening actions of the FDA and purchasers of bulk cefaclor. Additionally, there is no assertion, at present, that the interference alleged has been done intentionally and with malice. Since Lilly has failed to assert a prima facie case of tortious interference with business relationships, Count IX is dismissed.

### H. Unfair Competition (Counts II, IV and X)

Counts II, IV and X of the Complaint allege that the conduct of all the defendants constitutes unfair competition in violation of N.J. Stat. Ann. § 56:4–1 and the common law.

■ The cause of action for unfair competition has been defined as involving the "misappropriation" or "tortious exploitation" of one's property by another. *See Columbia Broadcasting Sys., Inc. v. Melody Recordings, Inc.*, 134 N.J.Super. 368, 377, 341 A.2d 348 (App.Div.1975); *New Jersey Optometric Ass'n v. Hillman–Kohan Eyeglasses, Inc.*, 144 N.J.Super. 411, 427, 365 A.2d 956 (Ch.Div.1976). Unfair competition includes both "the simulation of the appearances of goods with intent to 'pass off'" and the "simulation of appearance of business facilities or advertising methods in such a manner as to deceive the public into believing they are dealing with the originator rather than the simulator of such methods." *Fotomat Corp. v. Photo Drive–Thru, Inc.*, 425 F.Supp. 693, 708 (D.N.J.1977) (citations omitted). Therefore, under New Jersey common law, unfair competition encompasses two separate torts: (1) passing off one's goods or services as those of another; and (2) unprivileged imitation. *SK&F, Co. v. Premo Pharm. Lab., Inc.*, 625 F.2d 1055, 1062 (3d Cir.1980); *New Jersey Optometric*, 144 N.J.Super. at 427, 365 A.2d 956.

#### Passing Off

To state a passing off claim, a plaintiff must show that defendant "put a product into

---

**49.** New Jersey courts have referred to a claim of tortious interference with business relationships as tortious interference with: "prospective economic relationship", "prospective business ad- vantage", "business relations" or "economic relations." Regardless of the terms employed, the elements necessary to establish such a claim remain identical.

a dealer's hands which a producer can reasonably anticipate may be easily passed off as the goods of another." *Boehringer Ingelheim G.m.b.H. v. Pharmadyne Lab.*, 532 F.Supp. 1040, 1061 (D.N.J.1980). "Thus to support a passing off claim, one must demonstrate the likely confusion of one's products with another's goods, such that the public is deceived." *Id.* "[I]t is actionable conduct under New Jersey law for a drug manufacturer to put a product in the hands of a pharmacist in a form in which the manufacturer can reasonably anticipate that it may be passed off as another product even if the manufacturer does nothing else to encourage passing off." *SK&F*, 625 F.2d at 1062 (citation omitted). Courts look to whether the drug manufacturer copied the drug in question "with the reasonable anticipation that pharmacists would illegally substitute [the copied drug] for" the original. *CIBA–GEIGY Corp. v. Bolar Pharm. Co., Inc.*, 747 F.2d 844, 853 (3d Cir.1984).

Lilly argues that it has stated a claim for passing off because defendants represented to the FDA that Opos cefaclor is the equivalent of CECLOR in active ingredients, strength, dosage form, route of administration and conditions of use. *See* Pl's. Br. Opp. to Mot. to Dismiss, at p. 66 n. 30. Lilly claims that defendants were passing off Opos cefaclor as being the same as Lilly's CECLOR. *Id.* However, as stated in *supra* Part B, the Complaint does not allege that Opos cefaclor is not bioequivalent or substitutable for Lilly's CECLOR. Thus, Lilly has failed to state a claim of passing off because it has not alleged that any of the defendants tried to pass off Opos cefaclor as Lilly's CECLOR. Furthermore, Lily has not alleged that defendants expected that pharmacists would illegally substitute Opos' cefaclor for Lilly's CECLOR.

*Unprivileged Imitation*

To state a claim of unprivileged imitation, a plaintiff must show (1) that an imitated feature of its product is non-functional; (2) that the imitation is likely to cause confusion as to the product's origin in the eyes of the consuming public; and (3) that the prod-

uct has acquired secondary meaning. *Ciba–Geigy*, 747 F.2d at 850. "Proof of nonfunctionality generally requires a showing that the element of the product serves no purpose other than identification. In the case of a drug, the allegedly nonfunctional element must not enhance efficacy." *Id.* at 850 (citing *SK&F*, 625 F.2d at 1063). "Secondary meaning" is established by showing that the article in question "has become associated in the public mind with the first comer as manufacturer or source." *Id.* at 851 (citation omitted).

Lilly has failed to allege the first element of unprivileged imitation—that defendants imitated a nonfunctional feature of CECLOR. Lilly alleges that generic cefaclor imitates CECLOR. However, Lilly has not alleged that the imitated feature—e.g. color or appearance—of the generic cefaclor was nonfunctional. Thus, Lilly has failed to assert a claim of unprivileged imitation.

Lilly has failed to assert a claim of passing off or unprivileged imitation. Accordingly, Count X is dismissed.

*Statutory Unfair Competition*

N.J. Stat. Ann. § 56:4–1 (West 1989) codifies New Jersey's "common law authority of unfair competition." *National Football League Properties, Inc. v. New Jersey Giants, Inc.*, 637 F.Supp. 507, 519 (D.N.J.1986). The statute proscribing unfair competition provides:

> No merchant, firm or corporation shall appropriate for his or their own use a name, brand, trademark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals.

N.J. Stat. Ann. § 56:4–1.

The Third Circuit has observed that the federal law of unprivileged imitation under § 43(a) of the Lanham Act is equivalent to the New Jersey law of unprivileged imitation under both N.J. Stat. Ann. § 56:4–1 [50] and the New Jersey common law. *See, e.g.*, *Ciba–Geigy*, 747 F.2d at 854. Furthermore, N.J. Stat. Ann. § 56:4–1, is the statutory equivalent of § 43(a) of the Lanham Act and

---

50. N.J. Stat. Ann. § 56:4–1 has typically been applied to redress unprivileged imitation. *See, e.g.*, *Ciba–Geigy*, 747 F.2d at 854; *Apollo Distrib.*

*Co. v. Jerry Kurtz Carpet Co.*, 696 F.Supp. 140, 143 (D.N.J.1988).

"the two can be treated alike for analytical purposes." *Warner Lambert Co. v. McCrory's Corp.*, 718 F.Supp. 389, 396 (D.N.J.1989) (citing *American Greetings Corp. v. Dan-Dee Imports, Inc.*, 807 F.2d 1136, 1141 (3d Cir.1986)). "[E]xcept for the interstate commerce requirement [of the Lanham Act], the elements of the unfair competition torts proscribed by New Jersey law and by section 43(a) of the Lanham Act are the same ..." *SK&F*, 625 F.2d at 1065–66; *see also Apollo Distrib.*, 696 F.Supp. at 143. Since Lilly has failed to state a claim of unfair competition under section 43(a) of the Lanham Act or the common law, its claim under N.J. Stat. Ann. § 56:4–1 also fails. Accordingly, Counts II and IV are dismissed.

### I. *Unjust Enrichment (Count XI)*

Count XI of the Complaint alleges that the conduct of all the defendants "has conferred a measurable benefit on the defendants under circumstances such that their retention of the benefit without payment to Lilly would be unjust." Complaint ¶ 133.

 In New Jersey, the tort of unjust enrichment rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. *Callano v. Oakwood Park Homes Corp.*, 91 N.J.Super. 105, 108, 219 A.2d 332 (App.Div. 1966). To assert a claim of unjust enrichment a plaintiff must show that "it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *VRG Corp. v. GKN Realty*, 135 N.J. 539, 554, 641 A.2d 519 (1994) (citations omitted). Thus, it is the plaintiff's (as opposed to a third party's) conferral of a benefit on defendant which forms the basis of an unjust enrichment claim.

 Lilly alleges that defendants have been enriched through profits earned on sales of Opos generic cefaclor that the FDA approved based upon the false and misleading Opos AADA. Lilly claims defendants earned their profits at Lilly's expense because Lilly could have earned those profits had defendants not fraudulently obtained FDA approval for Opos cefaclor. Therefore, Lilly argues, it is entitled to defendants' prof-

its. However, Lilly has failed to state a claim of unjust enrichment because it has not alleged (nor could it prove) that it conferred a benefit on defendants. *See Barr Lab. I*, 827 F.Supp. at 120; *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 615 F.Supp. 838, 856 (S.D.N.Y.1985), *aff'd*, 797 F.2d 70 (2d Cir.1986). Accordingly, Count XI is dismissed.

### J. *Common Law Conspiracy (Count VIII)*

Count VIII of the Complaint alleges that Opos' and the Roussel Defendants' sale of cefaclor and their deceptive and fraudulent conduct "occurred as the result and object of an unlawful civil conspiracy in that [their] tortious actions were the result and object of a combination and agreement of two or more persons who were engaged in concerted action to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means." Complaint ¶ 122.

 In New Jersey, the essential elements of a civil conspiracy are: (1) combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose to be achieved by unlawful means; and (4) special damages. *Board of Ed. of the City of Asbury Park v. Hoek*, 66 N.J.Super. 231, 241, 168 A.2d 829 (App.Div.1961), *rev'd in part on other grounds*, 38 N.J. 213, 183 A.2d 633(1962). However, a plaintiff need not prove that the unlawful agreement was express or that each participant in the conspiracy knew the "exact limits of the illegal plan or the identity of all participants," as long as plaintiff alleges that each participant shared in "the general conspiratorial objective." *Morgan v. Union County Bd. of Chosen Freeholders*, 268 N.J.Super. 337, 365, 633 A.2d 985 (App.Div.1993). The plaintiff need not provide direct evidence of the agreement between the conspirators; it is enough that it could be circumstantially inferred from the facts that the conspirators had reached an understanding. *Id.; see also Hoek*, 66 N.J.Super. at 241, 168 A.2d 829.

 A civil action for conspiracy is essentially a tort action. Therefore, to maintain an action for civil conspiracy, a plaintiff

must also point to (1) an overt act of one or more of the conspirators in furtherance of the conspiracy; and (2) consequential damage to the rights of another, of which the overt act is the proximate cause. *Hoek,* 66 N.J.Super. at 241, 168 A.2d 829. Plaintiff cannot bring an action alleging civil conspiracy unless defendants committed an act which would be actionable even without the conspiracy. *Middlesex Concrete Products & Excavating Corp. v. Carteret Indus. Ass'n,* 37 N.J. 507, 516, 181 A.2d 774 (1962). Thus, "the conspiracy is not the gravamen of the charge, but merely a matter of aggravation, enabling the plaintiff to recover against all the defendants as joint tortfeasors." *Hoek,* 66 N.J.Super. at 241, 168 A.2d 829. The actionable element is the tort which the defendants agreed to perpetrate and which they actually committed. *Landriani v. Lake Mohawk Country Club,* 26 N.J.Super. 157, 159, 97 A.2d 511 (App.Div.1953).

Lilly has failed to establish a right of action against Opos or the Roussel Defendants under any of its statutory or common law theories.[51] A conspiracy is not actionable absent an independent wrong; therefore, the dismissal of Lilly's other causes of action requires dismissal of the conspiracy claim. *See Tynan v. General Motors Corp.,* 248 N.J.Super. 654, 668–69, 591 A.2d 1024 (App.Div.1991), *rev'd in part on other grounds,* 127 N.J. 269, 604 A.2d 99 (1992). Accordingly, Count VIII is dismissed.

### ORDER

This matter having come before the Court on the motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) and Fed.R.Civ.P. 9(b) of defendants Roussel Corporation; Roussel–Uclaf Holdings Corporation; Hoechst Marion Roussel, Inc.; The Rugby Group, Inc.; and Rugby Laboratories, Inc.; and it appearing that the other motions before the Court are the motion of defendants Roussel–Uclaf, S.A. ("Roussel–France") and Biochimica Opos, S.P.A. ("Opos") to dismiss for insufficiency of service of process or, in the alternative, for failure to state a claim and the motion of defendants American Home Products Corporation, American Cyanamid Company, Zenith

Goldline Pharmaceuticals, Inc. and Zenith Laboratories, Inc. to dismiss the counts alleged against them (counts III, IV, X and XI) pursuant to Fed.R.Civ.P. 12(b)(6); and the Court having considered the submissions of the parties; and good cause appearing;

IT IS on this 30th day of June, 1998,

ORDERED that defendants Opos' and Roussel–France's motion to dismiss for insufficiency of service of process, pursuant to Fed.R.Civ.P. 12(b)(5) is DENIED;

IT IS FURTHER ORDERED that the motion to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) is GRANTED as to Counts I through XIII and XV; and DENIED as to Count XIV;

IT IS FURTHER ORDERED that Counts I through XIII and XV are DISMISSED, without prejudice, pursuant to Fed.R.Civ.P. 12(b)(6); and

IT IS FURTHER ORDERED that a copy of this Order be served on all parties within seven (7) days of the date of this Order.

---

**51.** The conspiracy claim under NJ RICO § 2C:41–2d cannot suffice as a predicate for a common law claim of conspiracy.